# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2000-KA-01690-SCT

*T. W. KING*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 02/11/2000 |
| TRIAL JUDGE: | HON. W. ASHLEY HINES |
| COURT FROM WHICH APPEALED: | LEFLORE COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | W. S. STUCKEY, JR. |
| | WHITMAN D. MOUNGER |
| ATTORNEYS FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: JEFFREY A. KLINGFUSS |
| DISTRICT ATTORNEY: | FRANK CARLTON |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 10/25/2001 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | 11/15/2001 |

### BEFORE PITTMAN, C.J., COBB AND DIAZ, JJ.

### DIAZ, JUSTICE, FOR THE COURT:

¶1. T. W. King (King) was indicted in the Leflore County Circuit Court for capital murder with the underlying felony being arson. Prior to trial, the capital portion of the indictment was dismissed. King then faced trial for murder less than capital and arson. A jury trial commenced on February 9, 2000, with Judge W. Ashley Hines presiding. At the conclusion of the State's case in chief, King moved for a directed verdict, which was denied. Subsequently, King put forth his case. At the conclusion of the trial, the jury returned a verdict of guilty for both the charges of murder and arson. Accordingly, King was sentenced to life in the custody of the Mississippi Department of Corrections (MDOC) on the murder conviction and twenty years for arson to run concurrently with the life sentence. In answer, King filed a motion for new trial or judgment notwithstanding the verdict, which was denied. Then, he timely perfected appeal and challenges his conviction and sentence contending that (1) the evidence is insufficient to support the jury's verdict and (2) the trial court erred in overruling his motion to dismiss for failure of the State to properly preserve certain physical evidence.

## FACTS

¶2. Although there was no eyewitness to the actual crime, the testimony of the various witnesses allows us to piece together the events of the evening in question.

¶3. Cora Lanette Moore testified that while walking in the "G.P." area of Greenwood, Mississippi, she saw King driving a green truck. He asked if she wanted to "get high," and the two proceeded to procure and

smoke crack cocaine. She further testified that King began to "act weird" which, in turn, caused her to feel nervous. Thus, she chose to leave King's company. Moore testified that as she got out of the truck, King noticed Emma Lou Pitts (Pitts), the victim, and asked Moore to get Pitts to step over to the truck. Pitts got into the truck, and it drove off in the direction of Pitts's residence.

¶4. Next, Shinner Ellis testified that on the evening in question, she went to the victim's home on several occasions to see if Pitts wanted to join her in smoking some crack cocaine. She further testified that on at least two of these occasions, King was present, appeared intoxicated, and was treating the victim poorly (pulling her by the arm and waving a gun around). King was next seen by Ellis on her third trip to Pitts's home. She testified that King was drenched wet, carrying a screwdriver, and speaking to two police officers. At this time, she overheard King tell the policemen that he had just been robbed and thought that he had stabbed one of his assailants with the screwdriver. Upon knocking on Pitts's door, Ellis received no answer so she left. Finally, Ellis returned a fourth time and noticed smoke. Along with Rosemary Robinson, she banged on Pitts's door and got a neighbor to phone the fire department.

¶5. Early Nichols, Officer Michael Johnson, and Officer Reginald Dean all testified, as Ellis had, that King came running down the alley and told them the story of being robbed. The officers were in the area investigating an unrelated crime and looking for stolen merchandise. It was during their search that King approached them. The officers testified that King was soaking wet on the front part of his body but dry on his back. Furthermore, they noticed some blood on his shirt but no signs of injury to King's person. When asked, King declined filing a report on the alleged robbery. During the same search, the officers noticed a water leak under the bathroom of what was later discovered to be Pitts's home. They then left the area.

¶6. King was next seen by Michael Buchanan walking around the area without a shirt. Buchanan related that King had told him of the alleged robbery. King said the robbers had taken about $800, his truck, and his keys. Buchanan informed King that he knew where his truck was and took him to it. At which time, King then produced the allegedly stolen keys, got in the truck, and drove off. Buchanan also testified to hearing King tell the police officers of the robbery, as well as Lee Bell and another individual saying they had heard the same story.

¶7. The police officers returned to the area a couple of hours later in response to the call about the fire. After the fire was put out, Pitts's body was found in her bathtub. The medical examiner would later testify that she had died of fresh water drowning. In addition to the signs of drowning, the medical examiner testified that Pitts was beaten quite severely; she had bruises and several cuts on her head and face. Specifically, the medical examiner noted that Pitts had a large contusion covering her left eye and cheek, other bruises to her lips, a series of small cuts on her forehead, larger scraps on her left cheek, a scratch and small cut on her left hand fingers, a bruise on her left arm, and a large contusion across much of her chest.

¶8. With additional help, the officers again searched the area, this time looking for evidence related to the fire and apparent homicide. In the search, they found a cell phone belonging to King's girlfriend, Catherine Andrews, under a burnt paper sack.

¶9. To fill in the gaps, Andrews, King's live-in girlfriend for five years, testified that King had left the house between 7:30 and 8:00 p.m. that evening. He returned between 3:30 and 4:00 a.m., and explained that he had been robbed in G.P. He also explained that he had dropped her phone and was going to return to the area to look for it. After an unsuccessful solo attempt, King persuaded Andrews to come with him but upon seeing the fire engines, left the area before looking for the phone. Later that morning, after King was taken

into custody, the police searched Andrews's home with her permission. She identified and handed over the shirt, which was still quite damp and somewhat hidden, and the pants King had been wearing that evening.

¶10. King has consistently denied killing Pitts and setting fire to her house, and he has persisted in claiming he had been robbed.

¶11. The only other pertinent facts concern the handling of evidence. All possible evidence was placed in plastic evidence bags and labeled. Bloody paper towels found near the scene of the crime were identified as having human blood on them; however, the blood was inconsistent with both Pitts and King. The shirt obtained from Andrews was bagged as evidence, but not frozen. It was later tested, and the blood found on the shirt was identified as human blood. However, the samples had degraded to such a degree that DNA testing revealed no results.

## DISCUSSION

### I. WHETHER THE EVIDENCE IS INSUFFICIENT TO SUPPORT THE JURY'S VERDICT.

¶12. Through this assignment of error, King is essentially challenging the sufficiency and weight of the evidence that form the basis for his conviction. When the sufficiency and weight of the evidence are questioned, the allegation is really being directed against the accuracy of the jury's verdict. *May v. State*, 460 So. 2d 778, 780-82 (Miss. 1994). The assignment of error is predicated upon the contention that the evidence simply does not justify a finding of guilt beyond a reasonable doubt. However, it is a fundamental principle of law that jury verdicts will not be disturbed except under the most dire of circumstances. *Manning v. State*, 735 So. 2d 323, 333 (Miss. 1999). Accordingly, in our review of criminal convictions, we consider the evidence in the light most favorable to the conviction. *Id.* If then we decide that no reasonable person could have found the accused guilty beyond a reasonable doubt, the verdict will be set aside. *Id.* However, if our review reveals that "reasonable and fair-minded jurors in the exercise of impartial judgment might have reached different conclusions, the verdict of guilty is thus placed beyond our authority to disturb." *Id.*

¶13. King asserts that the State's case was based entirely on circumstantial evidence. Furthermore, he goes on to suggest that the already weak evidence's character is suspect at best, given the unreliable and dubious nature of the witnesses. King points out that many of the State's witnesses that saw him that night admit to being long time drug addicts, as well as having used drugs on the very night in question. In his brief, King takes issue with each witness individually and sets forth his reasons why their testimony should not be trusted. In addition, King reiterates the robbery story and various other portions of his statement to the police and claims that other witnesses corroborate his version of events. Finally, King attacks the weight of the physical evidence and proposes alternate theories of the crime, such as the robbers that assaulted him could be responsible for Pitts's death. King even points to certain aspects of the physical evidence to support his theory (e.g. the blood on the paper towels not matching him nor the victim). In conclusion, King asserts that even when viewed in the light most favorable to support the conviction, the evidence is insufficient.

¶14. As pointed out by the State, there was an abundance of evidence in support of King's conviction. A thorough review of the record reveals that all of the concerns and problems King asserts the witnesses suffered from were brought out and addressed by counsel. The jury heard about the drugs, promiscuity, and

stealing. The jury also heard the State's version of events, as well as King's story. Essentially, King now asks this Court to reweigh the credibility of witnesses. It is a well-settled principle of law that issues of weight and credibility of witness testimony are within the sole province of the jury as fact finder. *Humphrey v. State*, 759 So. 2d 368, 387 (Miss. 2000). The jury has a much better vantage point to view and assess the tone, mannerisms, and disposition of witnesses. True, most of the State's witnesses were not choirboys, but there was also physical evidence and the testimony of two police officers tying King to the murder. Given the evidence in the record and the fact that the jury was properly instructed, we find ample evidence to support the conviction. Thus, this issue is without merit.

### II. WHETHER THE TRIAL COURT ERRED IN OVERRULING HIS MOTION TO DISMISS FOR FAILURE OF THE STATE TO PROPERLY PRESERVE CERTAIN PHYSICAL EVIDENCE.

¶15. King next contends that the State improperly handled and failed to preserve certain physical evidence, and thus, deprived him of his right to a fair trial and due process of law. Specifically, King points to the handling of the blood stained shirt and the fact that it could not be analyzed for DNA. The test for whether dismissal is warranted due to evidentiary snafus has been laid out in *Duplantis v. State*, 708 So. 2d 1327 (Miss. 1998) and *Banks v. State*, 725 So. 2d 711 (Miss. 1997); and was originally set forth in *Tolbert v. State*, 511 So. 2d 1368 (Miss. 1987). The test is:

> [T]he State's duty to preserve evidence is limited to evidence that is expected to play a significant role in the defense. To play a constitutionally significant role in the defense, the exculpatory nature of the evidence must have been (1) apparent before the evidence was destroyed and (2) of such a nature that the defendant could not obtain comparable evidence by other reasonable means.

*Banks*, 725 So. 2d at 714-15 (citing *Tolbert*, 511 So. 2d at 1372). King asserts that he has satisfied this test; and therefore, his conviction and sentence should be reversed and rendered.

¶16. In fact, the shirt was found wet and placed in a plastic evidence bag. However, the shirt was not frozen, as recommended by the testimony of expert Julie Golden of Reliagene Technologies as the best method for preserving items for DNA testing, especially a wet article of clothing. No evidence was introduced to suggest that articles of potential evidence are normally frozen by the Greenwood Police Department; actually, officers testified that they try to "bag" anything that may be evidence. However, it was stipulated that the lack of proper preservation (freezing rather than mere storage) led to DNA being degraded by bacteria. Golden compared cuttings from the shirt to samples of Pitts's and King's blood. In the end, valid DNA results could not be obtained from the shirt in question.

¶17. Does such evidence fulfill the *Tolbert* test? As to the first prong, there is little doubt that the exculpatory nature of the evidence was apparent before it was allowed to spoil. After all, this case deals with a homicide. The DNA testing could have shown that Pitts bled on King sometime that night, or it could have bolstered King's version of events by substantiating his claims of being attacked by unknown assailants. Such evidence would have gone a long way in giving King's story some credence and weight.

¶18. The second prong of the test is somewhat more difficult. While the DNA testing could have lent a hand to King's defense, he was still able to put forth his theory. Furthermore, he even was able to use other physical evidence to support his version of events, namely the paper towels which had blood on them that did not match King or Pitts. King could have and did argue that the blood on the paper towels came from

the same person as the blood on his shirt, and he argued that but for the shoddy work of the police department, he would have had more evidence of his innocence. So, even though it is undeniable that the DNA testing would have played a role in this case, King was still able to present his argument to the jury.

¶19. In addition to the two enumerated prongs of the test, *Tolbert* also held:

> "the mere possibility the evidence might aid the defense does not satisfy the constitutional materiality standard." *United States v. Binker*, 795 F.2d 1218, 1230 (5th Cir.1986); *United States v. Webster*, 750 F.2d 307, 333 (5th Cir.1984). In deciding whether the destruction of evidence constituted a due process denial, the *Trombetta* Court also considered whether the government agents had acted in good faith and in accord with their normal practice or had made a conscious effort to suppress exculpatory evidence. *California v. Trombetta*, 467 U.S. 479, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984).

*Tolbert,* 511 So.2d at 1372. "[W]e do not believe [King] was prejudiced . . . by the absence of this alleged evidence. [King] fails to present any compelling evidence of fraud or intentional suppression of the truth on the state's behalf." *Duplantis*, 708 So. 2d at 1338. Furthermore, our review of the record shows that, at best, this evidence would have only aided King's defense; it was not a necessary element of it. Thus, since the DNA testing would have only been an aid in King's defense and there is no evidence of bad faith on the part of the State, we find this issue to be without merit.

## CONCLUSION

¶20. A jury verdict will not be disturbed unless this Court concludes that no reasonable jury could have found the accused guilty beyond a reasonable doubt, viewing the evidence in the light most favorable to a conviction. King did not overcome this rather high standard. In fact, we find ample evidence in the record to support a conviction in the present case.

¶21. While the State bobbled the handling of the physical evidence in this case (as evinced by its stipulation to the same), the absence of the evidence in question was not so significant to the defense as to warrant reversal of his conviction. We do take this opportunity, however, to admonish law enforcement to take all necessary precautions in the future. Convictions in cases similar to the present case need to be beyond reproach, so as to ensure fair and exacting justice.

¶22. Since we find no err in the record, we therefore affirm the conviction and sentence imposed by the Leflore County Circuit Court.

¶23. **COUNT I: CONVICTION OF MURDER AND SENTENCE OF LIFE IMPRISONMENT IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, AFFIRMED. COUNT II: CONVICTION OF ARSON AND SENTENCE OF TWENTY YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, AFFIRMED. SENTENCE IN COUNT II SHALL RUN CONCURRENTLY WITH SENTENCE IN COUNT I.**

> **PITTMAN, C.J., McRAE, P.J., SMITH, MILLS, WALLER AND EASLEY, JJ., CONCUR. COBB, J., CONCURS IN PART. BANKS, P.J., CONCURS WITH SEPARATE WRITTEN OPINION JOINED BY COBB, J.**

**BANKS, PRESIDING JUSTICE, CONCURRING:**

¶24. I agree with the result here, but I differ with the majority on its analysis of the spoilation issue. I do not think that the exculpatory nature of the evidence was readily apparent. If the DNA revealed that it was Pitts's blood, it would be inculpatory. The police could not know in advance which way it would turn out.

¶25. As to the second prong, I do not think that there is comparable evidence. This is blood on King's shirt not on paper towels in the area unconnected to him or Pitts. Nor do I think that the fact that King was able to make argument to the jury about the absence of an ability to prove that the blood was not his, fits the category of "comparable proof."

¶26. In short, I think that this situation flunks the first rather than the second prong of the test reiterated in ***Banks v. State,*** 725 So. 2d 711, 715 (Miss. 1997). While in ***Banks*** there could be no certainty that the evidence was exculpatory, unlike here, there was expert testimony from the State regarding the evidence which the defendant could not meet because of the spoilation.

## COBB, J., JOINS THIS OPINION.