759 So.2d 1258 (2000)
William Antonio WILSON, Appellant,
v.
STATE of Mississippi, Appellee.
No. 1998-KA-01624-COA.
Court of Appeals of Mississippi.
May 23, 2000.
*1259 Wade M. Baine, Lewie G. Negrotto, IV, Gulfport, Attorneys for Appellant.
Office of the Attorney General by Dewitt T. Allred, III, Attorney for Appellee.
BEFORE McMILLIN, C.J., BRIDGES, AND PAYNE, JJ.
BRIDGES, J., for the Court:
¶ 1. William Antonio Wilson, Willie Clarence McCall and Brian Anthony Lanier were charged with the capital murder of William Dean Allen and the aggravated assault of Darlene W. Allen on or about October 25, 1996 in Gulfport, Mississippi. Severance of the trials was granted May 20, 1998. Wilson was tried in mid-October 1998 in the Circuit Court of Harrison County. The jury returned a verdict of guilty on both counts on October 16, 1998, but could not agree on a suitable punishment. The trial court sentenced Wilson to serve life in prison for capital murder and twenty years for aggravated assault, with the sentences to run consecutively. A motion for a new trial was filed on October 22, 1998 and overruled. A timely appeal was filed to this Court alleging the following four errors
I. WHETHER THE LOWER COURT ERRED IN FAILING TO REQUIRE THE STATE TO GIVE RACE NEUTRAL REASONS FOR THE EXCLUSION OF A BLACK JUROR.
II. WHETHER THE LOWER COURT ERRED IN NOT SUPPRESSING THE STATEMENT WILSON *1260 GAVE POLICE UPON HIS ARREST.
III. WHETHER THE LOWER COURT ERRED IN NOT SUPPRESSING THE PHOTO LINE-UP IDENTIFICATION BY DARLENE ALLEN OF WILSON.
IV. WHETHER THE VERDICT WAS AGAINST THE OVERWHELMING WEIGHT AND SUFFICIENCY OF THE EVIDENCE.
Finding each alleged error without merit, we affirm the decision of the lower court.

FACTS
¶ 2. Around 4:00 in the afternoon on October 25, 1996, McCall and Lanier were at the South Mall Apartment complex in Montgomery, Alabama smoking marijuana. Soon thereafter, they walked to another apartment in the same complex to meet Wilson and a few other friends. While at Wilson's apartment, Wilson and McCall separated themselves from the rest of the group and spoke privately in an adjoining room. Shortly thereafter, Wilson and McCall emerged from their impromptu meeting and asked those in the room if they cared to "go for a ride." Lanier volunteered to join them on their trip, but had no idea where they were headed. The three men left the apartment complex in a silver-grey Ford Crown Victoria. After running a brief errand in town, Wilson steered the vehicle onto the highway for the ill-fated trip south to the Mississippi Gulf Coast. As soon as they were on the highway, McCall turned to Lanier and informed him that they were traveling to the Gulf Coast to commit a robbery on an out-of-town patron at one of the local casinos. They arrived in Mississippi around 11:00 that night and "rode around for awhile just checking out different casinos, checking out different people to rob."
¶ 3. On the evening of October 25, 1996, after leaving their Texas home earlier that day, Bill and Darlene Allen arrived in Mississippi to celebrate their anniversary and to visit their daughter, stationed at Kessler Air Force Base on the Gulf Coast. After eating dinner with their daughter, the Allens decided to celebrate their weekend out-of-town by enjoying a few games of video poker at a local casino. After a few hours at the gaming tables, the Aliens returned to the Comfort Inn motel on Highway 49 around midnight. Unbeknownst to them, the Allens were followed from the casino, down the highway and into the motel parking lot by Wilson, McCall and Lanier. Apparently the Allens fit the loose profile of potential victims envisioned by Wilson, McCall and Lanier because they had a Texas license plate on their silver van and were leaving a casino at a late hour.
¶ 4. As their evening wound down, Mr. Allen was about to leave the room to fill an ice bucket when a man forced the door open. Mr. Allen and the assailant, later identified as William Antonio Wilson, struggled violently with each other, making their way outside the room into the breeze way. Mrs. Allen heard a gunshot and ran outside to find Wilson on top of her husband. It appeared to her that Mr. Allen had been shot in the chest. Immediately after she crossed the door threshold, a second person, later identified as Willie Clarence McCall, put a gun to her head and threatened to kill her. At great risk to her own life, she ignored his threat and tried to aid her wounded husband. McCall thwarted her efforts by striking her in the back of her head, knocking her to her knees. Still she continued to try and reach her husband but Wilson, who was going through her husband's pockets, picked her up and threw her against a wall. After they robbed him, Mrs. Allen made her way back to her husband and covered his body with hers. As Wilson and McCall retreated down the breeze way to the waiting car, McCall fired several shots at the couple, narrowly missing them. Lanier observed the entire scenario in his capacity as a lookout from a distance of twenty five yards. The Gulfport Police Department and medical personnel were immediately summoned to the scene, but Mr. Allen died as a result of the gunshot wound to the chest. Mrs. Allen suffered *1261 injuries to her neck and head as a result of being struck by the pistol. For their efforts, each participant got about $150, which was divvied up at a Waffle House between Gulfport and Montgomery.
¶ 5. Taking the appellant's assignments of error out of order, we now proceed to the merits of his allegations.

LEGAL ANALYSIS

II. WHETHER THE LOWER COURT ERRED IN NOT SUPPRESSING THE STATEMENT WILSON GAVE POLICE UPON HIS ARREST.
¶ 6. On the basis of statements made by McCall to Gulfport police officers investigating the Allen case, the officers interviewed Wilson about what part, if any, he played in the commission of this senseless crime. During the course of that interview, Wilson made a statement to the police officers admitting that he was in Gulfport and involved with the crime. Detective Carvin testified that Wilson waived his Miranda rights, that Wilson was not threatened or coerced into making a statement, and that no promises were made to him in order to obtain his statement. On cross-examination, Carvin denied telling Wilson that he (Carvin) "couldn't do anything for him" if Wilson "didn't talk" to the officers. During the interview, Wilson made one phone call to his sister, a military police woman, and she told Wilson to "tell the police whatever they want to hear."
¶ 7. The trial judge found that allowing Wilson to make a phone call was not an offer of reward nor an inducement. Further, the trial court ruled that the conversation with his sister, since she was an uninvolved third party, in no way compromised the voluntariness of the statement regardless of her advice. "Conduct by third parties not connected with the law enforcement officers in the investigation will not vitiate a confession which might be rendered incompetent and inadmissible if such conduct had been committed by a law enforcement officer." Darghty v. State, 530 So.2d 27, 31 (Miss.1988). Wilson's conversation with his sister falls squarely within the letter of the enunciated law.
¶ 8. In Balfour v. State, the supreme court held that "determining whether a confession is admissible is a finding of fact which is not disturbed unless the trial judge applied an incorrect legal standard, committed manifest error, or the decision was contrary to the overwhelming weight of the evidence." Balfour v. State, 598 So.2d 731, 742 (Miss.1992). Both the prosecution and defense put on several witnesses at the suppression hearing who gave inconsistent testimony. This is of course, not unusual. The resolution of conflicts and contradictions in testimony at a suppression hearing is left to the trial judge as finder of fact. Alexander v. State, 610 So.2d 320, 328 (Miss.1992). So long as the trial judge made the requisite finding beyond a reasonable doubt that Wilson voluntarily made the confessional statements and where there is conflicting evidence but a finding of fact by the lower court that is not clearly erroneous, this Court must affirm the lower court. Alexander, 610 So.2d at 328. In the case sub judice, the trial judge used the correct legal standard and found the statements admissible. No clear error rendering the judgment reversible on this issue presents itself. This argument falls under the weight of supreme court precedent.

III. WHETHER THE LOWER COURT ERRED IN NOT SUPPRESSING THE PHOTO LINE-UP IDENTIFICATION BY DARLENE ALLEN OF WILSON.
¶ 9. In a photographic line-up ordered by the lower court at the request of defense counsel, Mrs. Allen identified the first gunman as Wilson. Wilson complains that his photo identification was tainted because the line-up was impermissibly suggestive. Wilson believes that because he is two to three inches taller than the other suspects in the photos according to height charts in the photo background, he was unfairly singled out by the police officers. This argument is without merit.
*1262 ¶ 10. Our supreme court has established that a photographic array containing pictures of the assailant viewed by the victim is not unduly prejudicial unless the assailant's photograph is notably different from the remaining photographs or the officer conducting the photo line-up makes some comment suggesting the identification of the assailant. Wilson v. State, 574 So.2d 1324, 1327 (Miss.1990) (quoting York v. State, 413 So.2d 1372, 1383 (Miss. 1982)). Further, even if the pre-trial photo line-up is determined to be unduly suggestive, a later in-court identification is still perfectly admissible unless, from the totality of the circumstances, the pre-trial identification was so suggestive as to create a "very substantial likelihood of irreparable misidentification." Wilson, 574 So.2d at 1327.
¶ 11. Mrs. Allen participated in the photographic line-up for the purpose of determining whether or not she could identify the defendant as the assailant. Mrs. Allen had not yet viewed a line-up of any kind, either physical or photographic. The defense objected vigorously to her identifying the defendant in court for the first time as the assailant because they believed that she would be "prone" to point out the only black individual in front of the rail not in the jury box. In an overabundance of caution, the trial judge ordered the State to conduct a photographic line-up. The trial court even went so far as to allow defense counsel to pick the place the photo would appear in the sequence of the six presented to Mrs. Allen. She immediately identified suspect number four, Wilson, as the perpetrator. Defense counsel made an ore tenus motion to suppress the photographic line-up.
¶ 12. Darlene Allen appeared in court at the suppression hearing and testified that she identified Wilson as the assailant from the photographic line-up. In regard to the photo identification, she testified that she relied upon the color and shape of his eyes rather than his height. She claimed that she did not notice the background numbers reflecting the height of each suspect in the photos. In this case, the trial court specifically found the absence of suggestiveness in the pre-trial identification, and nothing in the record discredits his conclusion. Based on the foregoing analysis we hold that a variance in height of two to three inches among six individuals posed in mug shot photographs in no way makes a photographic line-up impermissibly suggestive and that there was no substantial likelihood of misidentification.

I. WHETHER THE LOWER COURT ERRED IN FAILING TO REQUIRE THE STATE TO GIVE RACE NEUTRAL REASONS FOR THE EXCLUSION OF A BLACK JUROR.
¶ 13. Wilson argues that the State impermissibly excluded jurors based upon their race, without any other reason. The State excluded Juror # 34, an older married black man, as S-7 in the peremptory challenges. Earlier the State excluded Juror # 19, a black man, and gave as their reason his young age and single marital status, which didn't fit the jury profile that they wanted. Wilson believes that because the State offered a reason to exclude Juror # 19 but not Juror # 34, there must be a discriminatory purpose behind Juror # 34's exclusion. The exchange at trial went as follows:
THE COURT: Again, the State has accepted one, two,well, one, two, three, four, five, six.
MR. BAINE: And he seems to meet
THE COURT: Six blacks
MR. STEWART: Seven, Your Honor.
THE COURT: Actually seven and the Defense excused one.
MR. BAINE: Your Honor, this one seems to meet their profile. He is married and he is older.
THE COURT: Go ahead. For the record, but the Court is absolutely of the opinion that there is no pattern of systematic exclusion of blacks. That's an absolute in this case since they have accepted seven blacks.
MR. SIMPSON: Out of nine jurors, Your Honor, who have been accepted, six of *1263 those having been of the minority black, the State objects to having to recite reasons. If the Supreme Court finds us at fault, then we will let them send it back.
THE COURT: Mr. Simpson, I absolutely agree with you. There absolutely has not been any systematic exclusion of blacks. I agree with the State.
MR. BAINE: To which we object, Your Honor.
THE COURT: So noted.
¶ 14. Under Batson v. Kentucky, the party against whom a Batson motion is made is not required to give a race neutral explanation for the exercise of a peremptory challenge unless the trial court makes a threshold finding that the challenging party has made out a prima facie case of intentional discrimination. Once Wilson makes that prima facie case of intentional discrimination by the State, then the burden shifts to the State to come forward with a neutral explanation for challenging jurors of a cognizable group. Batson v. Kentucky, 476 U.S. 79, 97, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). This position was reaffirmed in Hernandez v. New York, when the U.S. Supreme Court said that if the requisite showing is made by the objecting party, the burden shifts to the responding party to articulate a neutral explanation for striking the jurors. Hernandez v. New York, 500 U.S. 352, 358, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991).
¶ 15. The State gave reasons for striking certain jurors in obedience to the trial judge's request in an effort to sufficiently protect the record. The State later objected to having to give such explanations without a prima facie showing having been made. The trial court stated that it required the State to provide the non-discriminatory reasons only "for the record" even though the trial judge found that there was "absolutely no pattern of systemic exclusion of blacks." From this evidence, it is clear that Wilson failed to make out a prima facie case for purposes of a Batson challenge. Accordingly, this assignment of error is dismissed.

IV. THE VERDICT WAS AGAINST THE OVERWHELMING WEIGHT AND SUFFICIENCY OF THE EVIDENCE.
¶ 16. Despite its label, the argument in appellant's brief under this assertion of error is merely a single paragraph restatement of the other three assignments of error. No authority is cited in support of this assignment of error in that lone summary paragraph. Failure to cite relevant authority obviates an appellate court's obligation to review the issue. Taylor v. State, 754 So.2d 598 (¶ 12) (Miss. Ct.App.2000) (citing Williams v. State, 708 So.2d 1358 (¶ 12) (Miss.1998)).
¶ 17. THE JUDGMENT OF THE CIRCUIT COURT OF HARRISON COUNTY OF CONVICTION ON COUNT I OF CAPITAL MURDER AND SENTENCE OF LIFE IMPRISONMENT; COUNT II OF CONVICTION OF AGGRAVATED ASSAULT AND SENTENCE OF TWENTY YEARS WITH SENTENCES TO RUN CONSECUTIVELY IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO HARRISON COUNTY.
McMILLIN, C.J., KING AND SOUTHWICK, P.JJ., LEE, MOORE, PAYNE, AND THOMAS, JJ., CONCUR. IRVING, J., CONCURS IN RESULT ONLY.