CARLSON, Presiding Justice,
for the Court.
¶ 1. Ahmad Butler was convicted of manslaughter by a jury in the Circuit Court of Lincoln County. He was sentenced to twenty years in the custody of the Mississippi Department of Corrections. Butler appeals, claiming that pretrial photo lineups were overly suggestive, that identifications were unreliable, and that the trial judge erred in denying his motion for a new trial. Butler’s arguments are without merit, and the trial court’s judgment of conviction and sentence is affirmed.
FACTS AND PROCEDURAL HISTORY
¶ 2. On the evening of June 16, 2010, Anthony Nichols and his girlfriend, Haley Brooke Terrell, and their friend, Jarrón Pappas, traveled from McComb to Brook-haven to sell a pit bull dog. The trio first talked to Pappas’s friend, Brent Fells, about purchasing the dog. During this conversation, a friend of Fells approached and expressed an interest in the dog; he also asked for a ride. The man told the trio that his name was “Little Black.” During the ride, Little Black gave Nichols drugs in exchange for the dog. Little Black gave Nichols his phone number and told him that if he needed anything else to give him a call. Nichols programmed the number into his cell phone under the contact name “Black.”
¶ 3. The next evening, Nichols, Terrell, and Pappas returned to Brookhaven to *263 purchase more drugs from Little Black. On this trip, the trio was accompanied by Cory Harris and Dorothy Crawford. Pap-pas pulled up to the designated location, Happy Food Mart, and Little Black approached the vehicle. Little Black instructed Pappas to “kill the car and turn off the lights.” Little Black then walked to a nearby car, returned with drugs, and handed them to Nichols. When Nichols tried to show the drugs to Pappas, Little Black reached for money that was in Nichols’s lap and then pulled out a gun, demanding that Nichols give him the money. Little Black and Nichols began to tussle, and Little Black shot Nichols in the head. Pappas drove Nichols to the hospital, and he later died from his injuries.
¶ 4. The four eyewitnesses — Pappas, Harris, Terrell, and Crawford — were asked to identify the shooter from photo lineups. Pappas was shown a one-page photo lineup, and he identified the defendant, Ahmad Butler, as the shooter. The suspects in the lineup were pictured standing beside a height marker. Butler was the only suspect within six inches of the height description that Pappas supposedly had given the police. Harris was shown a different one-page photo lineup, and he also picked Butler as the shooter. Harris later told Pappas that he was not sure he had identified the right person. Terrell was shown an array of single photos, from which she first chose Butler, then changed her mind and chose another suspect. Crawford could not identify the shooter from a photo lineup.
¶ 5. Detective Bobby Bell was the primary investigator in this case; he testified at trial and at a pretrial hearing on a motion to suppress the identifications of Butler. Detective Bell testified that the witnesses had referred to the shooter as “Black.” Pappas and Terrell testified at trial that they knew the shooter as “Black.” Contrary to the testimony of the State’s witnesses, the defense witnesses (Butler’s mother and two of her friends) testified at trial that Butler’s nickname had been “Shod,” and that they never had heard him referred to as “Little Black” or “Black.” Although Fells was not present when Nichols was shot, he testified that Butler was present at the dog sale the night before the murder. Fells also testified that the day after the murder, Butler admitted to Fells that he had shot the “dude that had the dog.” Detective Bell asked Fells to look at a photo lineup to identify the man he had introduced to Nichols the night before the shooting, who was the same man who had told Fells that he had shot the “dude that had the dog.” Fells identified Butler. Fells had known Butler for about nine years prior to the incident.
¶ 6. Butler was indicted for depraved-heart murder. Trial was held a year after the shooting. All four eyewitnesses — Pap-pas, Harris, Terrell, and Crawford — positively identified Butler in open court as the person who had shot Nichols. When the State rested, the defense moved for a directed verdict, which was denied. A jury found Butler guilty of manslaughter; and he was sentenced to twenty years in prison. Butler filed a motion for a judgment notwithstanding the verdict, or alternatively, for a new trial. In the one-paragraph motion, Butler averred that the verdict was against the overwhelming weight of the evidence; that the trial court had erred in failing to give a peremptory instruction to the jury requiring it to return a verdict of not guilty; and that the prosecution had failed to prove its case beyond a reasonable doubt.' No evidence was provided in support of Butler’s claims. The motion was denied. Butler now appeals to this Court.
*264 DISCUSSION
¶ 7. Butler presents two issues on appeal: (1) whether certain pretrial photo lineups were impermissibly suggestive, resulting in unreliable identifications; and (2) whether the trial court erred by failing to grant Butler’s motion for a new trial on the ground that the verdict was against the overwhelming weight of the evidence. Butler claims that the pretrial photo lineup shown to Pappas was unconstitutionally suggestive and that Pappas’s identification of Butler was not admissible. Butler also takes issue with the pretrial identification made by Terrell, because she first identified Butler, then chose another suspect. Butler asserts that the in-court identifications made by both Pappas and Terrell were unreliable.
I. Whether the pretrial identification made by Jarrón Pappas was the result of an unconstitutionally suggestive photo lineup, such that it should have been suppressed.
¶ 8. Butler argues that the trial judge erred in denying his motion to suppress Pappas’s pretrial identification of Butler, because the photographic lineup shown to Pappas was unconstitutionally suggestive. “The standard of review for suppression hearing findings in ... pretrial identification cases is whether or not substantial credible evidence supports the trial court’s findings that, considering the totality of the circumstances, in-court identification testimony was not impermissibly tainted.” Gray v. State, 728 So.2d 36, 68 (Miss.1998)(internal citations omitted). This Court will not disturb a lower court’s decision on the suppression of evidence unless “there is an absence of substantial credible evidence supporting it.” Id. For an identification (made out of court or in court) to be excluded, it must be the result of an impermissibly suggestive lineup and the identification must be unreliable. York v. State, 413 So.2d 1372, 1383 (Miss.1982). We find that the photo lineup shown to Pappas was suggestive, but Pap-pas’s pretrial and in-court identifications were reliable; thus, the trial judge did not err in denying Butler’s motion to suppress.

A. The photo lineup shown to Pappas was impermissibly suggestive.

¶ 9. A lineup or series of photographs is impermissibly suggestive if “the accused, when compared with the others, is conspicuously singled out in some manner from the others, either from appearance or statements by an officer[.]” Id. Butler claims the lineup shown to Pappas was suggestive because each of the photos had a height ruler beside the person in the picture, and Butler was the only suspect within six inches of the height description allegedly given by Pappas. Detective Bell testified that Pappas believed the shooter was approximately five-feet-five-inches tall. At the suppression hearing, Pappas did not recall telling police that he thought Butler was five-feet-five-inches tall.[1] The State contends that the lineup was not overly suggestive, because at the suppression hearing, Pappas testified that he “didn’t pay attention to the [height] ruler at all.” The test is whether the defendant was “conspicuously singled out in some manner from the others,” not whether the witness noticed that the defendant was singled out. Id.
*265 ¶ 10. To be excluded, an out-of-court identification must have resulted from an identification procedure that was so impermissibly suggestive as to give rise to “a very substantial likelihood of mis-identification.” Id. (quoting Neil v. Biggers, 409 U.S. 188, 196-98, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972)). Where the defendant is “the only one depicted with a distinctive feature,” courts usually will find the lineup to be impermissibly suggestive. Bankston v. State, 391 So.2d 1005, 1008 (Miss.1980)(where defendant was the only one with a mustache, and victim specifically remembered the robber had a mustache, the photo lineup was impermissibly suggestive). See also Shaw v. State, 74 So.3d 379, 382 (Miss.Ct.App.2011)(lineup was suggestive where defendant was the only suspect with a large Afro hair style; plus, defendant was holding a whiteboard displaying the date of the crime).
¶ 11. On the other hand, “minor differences” with the suspects or differences in the photograph backgrounds will not render a lineup impermissibly suggestive. See Jones v. State, 993 So.2d 386, 393 (Miss.Ct.App.2008)(where defendant was the only one wearing a coat, difference was minor and not impermissibly suggestive); Dennis v. State, 904 So.2d 1134, 1136 (Miss.Ct.App.2004)(where defendant’s picture was slightly larger than the others and the others were marked “Carroll Co. Det. Center,” the differences were minor and lineup was not impermissibly suggestive); Stradford v. State, 771 So.2d 390, 393 (Miss.Ct.App.2000)(absenee of criminal identification tags did not single out defendants); Anderson v. State, 724 So.2d 475, 478 (Miss.Ct.App.1998) (photos that differ in technique and background are not so distinctive as to single out a suspect imper-missibly). This Court has held that a photo lineup in which the suspect was the only one wearing a baseball cap, when the assailant’s description included a baseball cap, had “a suggestion of impermissibility,” but was not so impermissibly suggestive “as to give rise to a very substantial likelihood of misidentification.” Jones v. State, 504 So.2d 1196, 1199 (Miss.1987).
¶ 12. The Court of Appeals was presented with an issue similar to the one at hand, in which the defendant claimed that a photo lineup was impermissibly suggestive because he was “two to three inches taller than the other suspects in the photos according to height charts in the photo background.” Wilson v. State, 759 So.2d 1258, 1261 (Miss.Ct.App.2000). The Court of Appeals found that a height difference of two or three inches among six suspects was not a notable difference that would render the lineup impermissibly suggestive. Id. at 1262. We find that a height difference of two or three inches is not as distinct as a height difference of six inches; the significant height difference in this case is more akin to a “distinctive feature” that is suggestive.
¶ 13. Butler was singled out impermis-sibly, whether intentionally or unintentionally, from the rest of the individuals in the lineup. Detective Bell testified that Pap-pas had told the investigating officer that the assailant was around five-feet-five-inches tall. Butler is actually five-feet-six-inches tall. The other suspects in the photo lineup were between five-feet-eleven-inches and six-feet-four-inches tall. We find that the ruler showing the height of each suspect, considered in light of the testimony that Pappas thought the shooter was five-feet-five-inches tall and the significant height difference between Butler and the other suspects in the lineup, rises to the level of an impermissible suggestion. Again, the test is not whether the witness noticed the distinction or whether the suspect was intentionally singled out, the test is whether the defendant was “conspira- *266 ously singled out in some manner from the others.” York, 413 So.2d at 1383. Because we find that the photo lineup was impermissibly suggestive, the next step is to determine whether Pappas’s identification was nonetheless reliable.

B. The pretrial identification by Pappas was reliable.

¶ 14. An unnecessarily suggestive pretrial identification is not automatically excluded; rather, “evidence of a suggestive out-of-court identification will be admissible if, from a totality of the circumstances, the identification was reliable.” Id. at 1381. The identification will be excluded, however, if from the totality of the circumstances surrounding it, the identification procedure was so impermis-sibly suggestive that it gave rise to “a very substantial likelihood of misidentification.” Id. at 1381 (quoting Biggers, 409 U.S. at 196-98, 93 S.Ct. 375). In Biggers, the United States Supreme Court articulated five factors to consider when evaluating, from the totality of the circumstances, whether an out-of-court identification carries a substantial likelihood of misidentifi-cation:
[T]he factors to be considered in evaluating the likelihood of misidentification include [1] the opportunity of the witness to view the criminal at the time of the crime, [2] the witness’ degree of attention, [3] the accuracy of the witness’ prior description of the criminal, [4] the level of certainty demonstrated by the witness at the confrontation, and [5] the length of time between the crime and the confrontation.
Biggers, 409 U.S. at 199-200, 93 S.Ct. 375. The Biggers test was adopted by this Court in York v. State, and this Court held that an unnecessarily suggestive pretrial identification may be admissible if it is found to be reliable under the Biggers analysis. York, 413 So.2d at 1382.
¶ 15. Taking the Biggers factors into account, we conclude that Pappas’s identification was reliable. Pappas testified that he rode beside the shooter in a car for forty-five minutes the night before the shooting. Pappas also was present the next night when the shooting occurred, sitting in the driver’s seat of the car when Nichols was shot while sitting in the back seat. The shooter spoke directly to Pap-pas when he told Pappas to turn off the car and the lights. All the witnesses testified that the light was on inside the vehicle, and Detective Bell testified that the area where the shooting occurred had “pretty good lighting.” Pappas identified Butler quickly, after stating with confidence that he could identify the shooter. The identification was on June 18, the day after the shooting. Further, Pappas testified that he did not notice the height markers in the photographs. Pappas testified at the suppression hearing that he did not recall saying that he thought the shooter was about five-feet-five-inehes tall, so the height markers may have meant nothing to him even if he had noticed them. Each of the Biggers factors weighs in favor of reliability.
¶ 16. The evidence discussed here was before the trial judge at the hearing on Butler’s motion to suppress the pretrial identifications. This Court will not reverse a trial judge’s ruling on admission or suppression of evidence unless “there is an absence of substantial credible evidence supporting it.” Gray, 728 So.2d at 68. Although the photo lineup was suggestive, Pappas’s identification was reliable under the Biggers factors. Therefore, substantial credible evidence supports the trial judge’s denial of Butler’s motion to suppress Pappas’s identification.

C. The in-court identification by Pappas was reliable.

¶ 17. Butler also argues that the in-court identification made by Pappas *267 was unreliable because it was tainted by the suggestive pretrial identification. This Court has held that “[a]n impermissibly suggestive pretrial identification does not preclude in-court identification by an eyewitness who viewed the suspect at the procedure, unless: (1) from the totality of the circumstances surrounding it (2) the identification was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification.” York, 413 So.2d at 1883 (emphasis added) (internal citations omitted). The standard for in-court identifications is heightened because it requires the likelihood of irreparable misidentification. Id. Again, if the pretrial identification procedure was im-permissibly suggestive, the Biggers factors should be considered to determine reliability. Id.
¶ 18. As set forth above, we determined that the photo lineup shown to Pappas, in which Butler was the only suspect within six inches of the height description supposedly given by Pappas, was impermissibly suggestive. However, applying the Big-gers factors, Pappas’s pretrial identification of Butler was reliable. The same is true for Pappas’s in-court identification of Butler. The only factor that weighs against reliability for the in-court identification is the “length of time between the crime and confrontation.” A year had passed between the shooting and the day Pappas saw Butler in court. However, as set forth above, the remaining factors weigh in favor of reliability, thus, we find that Pappas’s in-court identification was reliable.
II. Whether Terrell’s in-court identification of Butler was based on an impermissibly suggestive pretrial lineup.
¶ 19. Butler claims that the pretrial lineup shown to Terrell was imper-missibly suggestive because she was shown an individual photograph of Butler. Butler adds that, because she ultimately chose a different suspect from the photo lineup, TerreE’s in-court identification of Butler was unreliable. The State contends that there was nothing impermissibly suggestive about the photograph, as it was merely part of a photographic array of suspects. This Court must first determine whether the pretrial photo lineup was im-permissibly suggestive. York, 413 So.2d at 1383. If so, the Court must apply the Biggers factors to determine if the in-court identification was otherwise reliable. Id. “An impermissibly suggestive pretrial identification does not preclude in-court identification by an eyewitness who viewed the suspect at the procedure, unless: (1) from the totality of the circumstances surrounding it (2) the identification was so im-permissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification.” Id.
¶20. Butler first contends that Terrell “was shown a single photo,” but later states that she was shown a “photographic array.” Certainly, for Terrell to change her mind and pick another suspect, she must have been shown more than one photo. Butler points out that “[t]he practice of showing suspects singly to persons for the purpose of identification, and not as part of a lineup, has been widely condemned.” Id. at 1377. That rule does not apply in this case, because, although Terrell was shown the photos one at a time, she was not shown only one photograph. “Pretrial photograph identifications have been generally upheld if the witnesses view the photographs separately and if there is no emphasis placed on certain photographs as opposed to others.” Burks v. State, 770 So.2d 960, 963 (Miss.2000)(citing Simmons v. U.S., 390 U.S. 377, 383, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968)).
*268 ¶21. A photo lineup is impermissibly suggestive when the photo of the accused “is conspicuously singled out in some manner from the others, either from appearance or statements by an officer.” York, 413 So.2d at 1383. Butler’s photograph was shown to Terrell as one photo in a series of photos. This does not make the lineup suggestive, and Butler failed to present anything about the lineup that was impermissibly suggestive.[2] Because there is no evidence that the pretrial lineup was impermissibly suggestive, we need not consider the Biggers factors.
¶ 22. Although Terrell first identified Butler in the pretrial photo array, she changed her mind and chose someone else. This supports Butler’s defense, as it creates a jury question as to Terrell’s reliability and credibility. Defense counsel questioned Terrell at length regarding her conflicting identifications. The weight and credibility to be given to a witness’s testimony “are within the sole province of the jury as fact finder.” King v. State, 798 So.2d 1258, 1262 (Miss.2001). The jury heard the evidence and the cross-examination and determined the weight and credibility to be given to Terrell. This Court will not reweigh the credibility of witnesses. Id Butler’s claims regarding Terrell’s identification are without merit.
III. Whether the trial court erred in failing to grant Butler’s motion for a new trial.
¶ 23. Our trial courts unquestionably have authority to grant a new trial when, in the exercise of sound discretion, it is determined that a guilty verdict in a criminal case is so contrary to the overwhelming weight of the evidence that to allow the verdict to stand would sanction an unconscionable injustice; and this Court on appeal reviews a trial court’s denial of a motion for a new trial applying the same standard. Jackson v. State, 90 So.3d 597, 605 (Miss.2012)(citing Bush v. State, 895 So.2d 836, 844 (Miss.2005)). This Court will reverse only if the Court determines that the trial court abused its discretion in denying a motion for a new trial. Dilworth v. State, 909 So.2d 731, 737 (Miss.2005). Butler contends that the trial judge abused his discretion when he denied Butler’s post-trial motion for a new trial.
¶ 24. Butler’s argument is that his conviction was “almost wholly based upon eyewitness testimony,” and that all of the eyewitness identifications — both pretrial and in court — were “procured under unreliable circumstances.” Thus, he claims that the jury’s verdict was against the overwhelming weight of the evidence. The State argues that the testimony of four eyewitnesses was consistent and not materially contradicted, and therefore it was sufficient to support the jury’s verdict.
¶ 25. In support of his argument that the eyewitness testimony was unreliable, Butler alleges the following:
a. Terrell, Harris, Pappas, and Crawford each admitted that they had *269 used drugs on the day of the murder.
b. During the pretrial photo lineup, Terrell initially identified Butler but changed her mind and chose a different suspect.
c. Harris told Pappas he was not sure if he had identified the right person in the lineup. Harris testified that he “didn’t pay much attention” during the drug transaction. Harris’s ex-girlfriend testified that she took Harris to the police station the day after the shooting to look at a lineup, and that Harris took Lorcet and Xa-nax on the way to the police station.[3]
d. Crawford identified Butler at trial one year after the murder, but she could not identify him in a pretrial lineup the day after the murder.
e. The lineup shown to Pappas was suggestive, and Pappas’s pretrial identification was unreliable. Pap-pas told police several different stories about the incident, and he was affiliated with a gang, which “cast serious doubt” on his credibility.
f. “Numerous” defense witnesses testified that Butler’s nickname was not “Black” or “Little Black.”[4]
The defense had an opportunity to cross-examine and impeach the witnesses on all of these issues, and the jury had to determine the weight and credibility that would be given to the witnesses in light of these concerns.
¶ 26. This Court understands that eyewitness testimony is not always reliable, however, we have “recognize[d] the rule that persons may be found guilty on the uncorroborated testimony of a single witness.” Doby v. State, 532 So.2d 584, 591 (Miss.1988). The verdict in this case is supported by the testimony of four eyewitnesses to the shooting, each identifying Butler as the shooter. In addition, Fells testified that Butler had confessed to him that he shot the “dude with the dog.” Fells had introduced Nichols to Butler the night before the shooting when Nichols was trying to sell the dog.[5] The State’s evidence was much more than “the uncorroborated testimony of a single witness,” which this Court has held is sufficient. Id.
¶ 27. “[Ijssues of weight and credibility of witness testimony are within the sole province of the jury as fact finder.” King, 798 So.2d at 1262. Defense counsel cross-examined each witness on the credibility issues that Butler cites on appeal, and the *270 jury resolved them in favor of the State. This Court will not reweigh the credibility of witnesses. Id. No evidence indicates that the trial judge abused his discretion in denying Butler’s motion for a new trial.
¶ 28. Although Butler focuses on his weight-of-the-evidence argument in support of his claim that he is entitled to a new trial, he does make a very brief alternative argument that he is entitled to have his judgment of conviction reversed, vacated, and rendered and that he should be discharged from custody. Thus, Butler also appears to make a legal-sufficiency-of-the-evidence argument. This Court has been clear that “[a] jury verdict will not be disturbed unless this Court concludes that no reasonable jury could have found the accused guilty beyond a reasonable doubt, viewing the evidence in the light most favorable to a conviction.” Id. at 1263. Assuming, arguendo, that Butler has asserted a legal-sufficiency-of-the-evidence argument, we find, based on today’s discussion, that this argument has no merit. See Jackson v. State, 90 So.3d 597, 603-05 (Miss.2012).
¶ 29. This Court does not sit as the finder of fact. Fact-finding is left to the trial courts, and we “review findings of fact with great deference.” Scott v. State, 981 So.2d 964, 969-70 (Miss.2008). The trial judge is the fact-finder during a suppression hearing, and this Court will not reverse a trial judge’s ruling on admission or suppression of evidence unless “there is an absence of substantial credible evidence supporting it.” Gray, 728 So.2d at 68. Once the evidence is admitted, the jury sits as the fact-finder and “determines the weight and credibility to give witness testimony and other evidence ... and, where the evidence justifies a verdict, it must be accepted as having been found worthy of belief.” Bayfield v. State, 22 So.3d 1175, 1188 (Miss.2009) (internal citations omitted).
¶ 30. In this case, when the State rested, the defense moved for a directed verdict. The trial judge denied the motion, finding that, viewing the evidence “in the light most favorable to the State” and considering “all reasonable inferences flowing from that evidence,” the State had met its burden for going forward. The defense renewed its motion after the State’s rebuttal, and the trial judge overruled the motion a second time. When a motion for a directed verdict is made, “the trial judge must consider all of the evidence.” Weeks v. State, 493 So.2d 1280, 1282-83 (Miss.1986)(quoting Gavin v. State, 473 So.2d 952, 956 (Miss.1985)). When the defense moved for a directed verdict, the trial judge had before him all the evidence that this Court has before it now. We have reviewed the evidence that was before the trial judge and, giving “great deference” to the trial judge as the finder of fact regarding suppression of evidence, we find that the trial judge’s decisions were supported by substantial credible evidence.
CONCLUSION
¶ 31. First, while the pretrial photo lineup shown to Pappas was unduly suggestive, a Biggers analysis reveals that Pappas’s pretrial and in-court identifications were reliable. Thus, the trial judge did not err in denying Butler’s motion to suppress Pappas’s identification. Second, the pretrial photo lineup shown to Terrell was not impermissibly suggestive. Although Terrell’s in-court identification was different from her pretrial identification, it was admissible, and her credibility was a question for the jury. Third, the trial court did not abuse its discretion in denying Butler’s motion for a new trial. Defense counsel cross-examined each of the *271 four eyewitnesses at length, and the jury decided any credibility issues in the State’s favor. Finally, assuming arguendo that Butler’s brief can be read also to assert a legal-suffieieney-of-the-evidence argument, the trial judge did not commit error in denying Butler’s motion for a judgment notwithstanding the verdict.
¶ 82. For the reasons discussed, the Lincoln County Circuit Court’s judgment of conviction and sentence is affirmed.
¶ 38. CONVICTION OF MANSLAUGHTER AND SENTENCE OF TWENTY (20) YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, AFFIRMED. APPELLANT SHALL PAY A FINE OF $5,000, COURT COSTS IN THE AMOUNT OF $308.50, FULL RESTITUTION FOR FUNERAL EXPENSES AND ATTORNEY FEES. SENTENCE SHALL RUN CONSECUTIVELY TO THE SENTENCE APPELLANT IS CURRENTLY SERVING.
WALLER, C.J., DICKINSON, P.J., RANDOLPH, LAMAR, KITCHENS, CHANDLER, PIERCE AND KING, JJ„ CONCUR.

. Although there is a discrepancy as to whether Pappas actually told the police that he believed Butler was five-feet-five-inches tall, the assumption that Pappas made that statement is the basis of Butler's argument on appeal. Butler asserts that the police chose the photos for the lineup "[w]ith the specific knowledge that Pappas indicated the shooter was approximately five-foot-five.”

. We note that there were height markers beside the suspects in the photographs shown to Terrell. As to Terrell, Butler did not argue that the height markers were suggestive. Although we found that the height markers were suggestive in the lineup shown to Pap-pas, we find that the lineup shown to Terrell was not suggestive. First, there is no evidence that Terrell gave police an estimate of the shooter’s height. Second, in the lineup shown to Terrell, two suspects were five-feet-six-inches tall. At the suppression hearing, Terrell testified that she did not remember if she noticed the height rulers when she viewed the lineup. Based on the circumstances and evidence presented surrounding Terrell's pretrial identification, we find that the lineup shown to Terrell was not impermissibly suggestive.

. Harris disputed his ex-girlfriend’s testimony and testified that he had not taken any pills or drugs prior to going to the police station. Further, although the girlfriend testified that she took Harris to the police station the day after the shooting, Harris actually went to the police station and viewed the lineup almost a week after the shooting, on June 23rd.

. Butler claims that "numerous witnesses testified” that his nickname was not "Black” or "Little Black.” The "numerous witnesses” were Butler’s mother and two of her friends.

. The photo of Butler shown to Harris and Fells looks very different from the photo of Butler shown to Pappas and Terrell. In the photo shown to Pappas and Terrell, Butler was much younger, had longer hair, his eyes were narrowed, and he was making an odd facial expression. In the photo shown to Harris and Fells, Butler had shorter hair and a goatee. (Presumably, the photo shown to Harris and Fells was taken after Butler was arrested, because Harris and Fells viewed the lineups after Butler was taken into custody. Pappas and Terrell viewed the lineups prior to Butler being taken into custody, so an older picture already on file was used.) Fells and Pappas made the most confident selections. Fells had known Butler for about nine years prior to the incident. Pappas had the best opportunity to see Butler, as he had sat next to him for forty-five minutes the night before the shooting and was in the driver’s seat of the vehicle the night of the shooting. Fells and Pappas each selected Butler, from two very different photos.