# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2019-KA-01343-COA

**MICHAEL AUDY McCOOL A/K/A MICHAEL A.**          **APPELLANTS**
**McCOOL A/K/A MICHAEL McCOOL AND**
**AUDY DAVID McCOOL A/K/A AUDY D.**
**McCOOL A/K/A AUDY McCOOL**

**v.**

**STATE OF MISSISSIPPI**          **APPELLEE**

| | |
|---|---|
| DATE OF JUDGMENT: | 03/18/2019 |
| TRIAL JUDGE: | HON. CLAIBORNE McDONALD |
| COURT FROM WHICH APPEALED: | PEARL RIVER COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANTS: | HARRY B. WARD |
| | MARTIN E. REGAN JR. |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: BRITTNEY SHARAE EAKINS |
| DISTRICT ATTORNEY: | HALDON J. KITTRELL |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 05/18/2021 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE WILSON, P.J., LAWRENCE AND McCARTY, JJ.**

**McCARTY, J., FOR THE COURT:**

¶1. After an exchange of gunfire at their family store, a father and son were killed. Another father and son were arrested and ultimately convicted of accessory after the fact to second-degree murder and second-degree murder, respectively. Finding no reversible error in the trial, we affirm.

## BACKGROUND

¶2. Jason McLemore and his wife Melanie owned a small gun store that doubled as a

convenience store called McLemore Arms. The store was located in Henleyfield in Pearl River County. In the afternoons, Melanie worked as a cashier handling daily business at the store, while Jason, a gunsmith, repaired the weapons at his workshop in a barn on their family property nearby.

¶3. One afternoon while Melanie was working alone in the store, a customer named Michael McCool entered with his sixty-four-year-old father, Audy McCool, to pick up a gun Michael had left for repair. In examining Michael's Walther P22 the previous week, Jason had determined that the weapon needed a new part, which Jason would have to order.

¶4. The McLemores had a policy to charge a fee in the event that Jason had taken steps toward fixing a weapon, such as ordering parts, and the customer decided to discontinue the McLemores' service prematurely. The amount of money charged depended on the extent of work performed and the price of parts ordered.

¶5. According to Melanie's testimony at trial, Jason and Michael had discussed the status of Michael's gun over the phone a few days before the McCools came to the store to pick up the pistol. Although Melanie admitted she did not know every detail of the conversation, she said that Jason had explained the service charge policy to Michael and said that he could come to the store if he would like to discuss it further. Jason told Michael that he worked at the store in the mornings and that his wife took over around 2:00 p.m.

¶6. The McCools arrived at the store around 3:00 p.m. Upon their arrival, Melanie informed Michael that he would need to pay the $25 service charge in order to pick up his

2

gun, since Jason had already ordered the necessary part. Michael disagreed, claiming that he could get the part directly from the manufacturer for free and therefore should not have to pay the McLemores' fee.

¶7. Melanie's phone records indicate that the McCools argued with Melanie over the fee for at least 10 minutes. At 3:00, Melanie sent a text message to Jason stating "the guy with the Walther is here." A minute later, Jason called Melanie, and they spoke for a few seconds. Melanie testified that on that call, she offered for Michael to speak to Jason, but Michael refused. Shortly thereafter, she sent another text telling Jason that Michael was "wanting to pick it up for free." A couple of minutes later, she sent a text saying "He's cussing me out now." Then she sent her last text to Jason, saying "They're still here."

¶8. Melanie testified that Michael grew increasingly agitated as their conversation progressed. She described him as becoming more and more belligerent, screaming in her face and calling her a "bitch," among other curse words. Meanwhile Audy was, according to Melanie, "pumping Michael up." Melanie also testified that Michael made threatening statements toward her, insinuating that he could take her husband in a fight.

¶9. Around this time, Jason, who had been working with his two sons at the barn, arrived at the store with his and Melanie's seventeen-year-old son Jacob. Jason entered the store first, with Jacob close behind. According to Melanie, her husband said to Michael, "Who are you cussing? If you have a problem, let's work it out."

¶10. Melanie recalled that Michael "immediately attacked" Jason, jumping on and hitting

3

him. On cross-examination, Melanie agreed that she thought "Michael was getting the better of" her husband. She testified that Jacob tried "to pull Michael off of his daddy." Audy also joined the fight. Melanie estimated the altercation lasted about ten to fifteen seconds. It culminated in gunfire.

¶11. In a state of shock, Melanie noticed her husband stumbling backward toward the front door and her son unconscious on the ground. Realizing her husband and son were severely injured, Melanie rushed over to check on them, then immediately called 911. Frantic and screaming, Melanie told the 911 dispatcher, "My husband and son have been shot by a customer," and "Please hurry, please." When asked whether the shooter was still in the building, Melanie responded, "Yes—he's—something's wrong with him too. Please hurry up and get them here, please."

¶12. Phone records show that Audy also dialed 911. He told the dispatcher that they needed multiple ambulances and that four people, including himself, had been shot. When asked about the status of the injured parties, Audy responded "Two possible dead, one very critical, and I'm shot myself." Audy urged the dispatcher to get the ambulances to the store quickly.

¶13. At some point before police arrived, Audy took Michael's gun, a .40-caliber Glock, from him. Audy walked through the scene, exited the store, and placed Michael's Glock on the floorboard of the McCools' car and covered it with a plastic shopping bag. He then reentered the store.

4

¶14. When officers arrived on scene, they saw Melanie coming out of the store to meet them. Jason was lying dead on his back in the front doorway of the store, having been shot three times and fallen backward through the glass door. Jacob, also having sustained three gunshot wounds, was found dead on the floor inside the store. Officers saw Audy standing over his son, who was injured and lying on the floor near Jacob. Audy was also injured, apparently having suffered a gunshot wound to his back.

¶15. Investigation would later reveal that Michael, Jason, and Jacob were all armed during the fight. Michael had the .40-caliber Glock that Audy placed in their car after the altercation. Evidence showed that Michael had fired the Glock five times. Jason had a 9mm Sig Sauer, which was found unholstered on the floor next to his right hand. One or two rounds had been fired from the gun.[1] Jacob carried a Smith & Wesson .357 Magnum, which was still in the holster with no rounds fired when police arrived. In addition to the gun, Jacob also carried a long, curved knife, which his mother Melanie testified he used for clearing brush and fending off snakes near their barn. The knife was found covered in blood and on the floor near Jacob's right hand, which was positioned above his head.

¶16. Melanie and Audy both appeared to have been unarmed. Melanie admitted to having access to at least one revolver that the McLemores kept behind the counter, but she insisted

---

[1] Lori Beall, a ballistics expert from the Mississippi Forensics Laboratory, testified that the maximum capacity of the gun was sixteen rounds and that fourteen live rounds remained in the gun. Therefore, it is possible that Jason fired two rounds. Only one 9mm round and one 9mm casing were recovered at the crime scene, but the McCools argue that the other round may have entered Audy's back.

she did not fire a gun that day.

¶17.   Sergeant David Bean and Corporal Jason Lee each questioned Michael at the scene. Michael claimed he shot the McLemores in defense of his father and himself.  He said that Jacob first started swinging his knife around and pushing Audy.  Michael said that Jason shot Audy, so he fired back.  When asked where the gun was, Michael told the officer that his father had put it in their car.

¶18.   Corporal Jason Lee, after questioning Michael, went outside to speak with Audy, who was being treated by paramedics and was about to be transported to a hospital.  When asked about the gun, Audy admitted without hesitation that he had placed it inside the McCools' car, and he told Corporal Lee that Michael had the car keys.  On appeal Audy argues that he placed the gun in the car for "safekeeping."

¶19.   The officer retrieved the keys from Michael and locked the car to secure potential evidence.  Ashley Moulton, the crime scene investigator who later examined the car, testified at trial that she found the gun on the passenger-side floorboard.  The pistol was hidden under a plastic shopping bag.

¶20.   Michael and Audy were transported directly to hospitals for treatment of their injuries. They were not arrested at the time.  About two months after the crime, Investigator Kristopher Robbins met with the McCools to take photographs of their injuries and to obtain DNA samples.

¶21.   Upon investigation, bullets consistent with having been fired from Michael's gun were

found at the store and in Jason's and Jacob's bodies. Five days after the initial investigation of the scene, a cleaning crew reported finding additional evidence at McLemore Arms, including clothing items, a shell casing, a gun holster, a bullet hole in a booth, and a bullet mark on a potato chip rack.

## COURSE OF PROCEEDINGS

¶22. On March 7, 2017, Michael was indicted for two counts of second-degree murder, and Audy was indicted for accessory after the fact.

¶23. At trial, Melanie, who was the sole surviving eyewitness aside from the McCools, testified that she did not know or remember who shot first. She testified "I never saw any weapons drawn . . . I don't know who did what." She also said "I know that somebody pulled a gun. I know that somebody shot. I don't know who did what."

¶24. During Melanie's testimony, the prosecution played her emotional 911 call for the jury. While desperately pleading for help for her husband and son, Melanie answered several questions from the 911 dispatcher regarding the incident. Notably, the dispatcher asked whether the shooter intentionally shot them, to which Melanie, in a moment of clarity, responded "Yes, yes, he did it on purpose."

¶25. When asked if her husband and son were alert, she responded "No, they're not alert at all. They're laying in pools of blood." She noted that both Jason's and Jacob's faces were covered in blood. The dispatcher asked Melanie to check their pulses, to which she said "I'm trying but I'm shaking so bad I can't tell." Of the events that had just occurred, Melanie

7

recalled "There was a customer in here, and he just started going nuts and he shot both of them." The dispatcher then asked whether the shooter had been trying to rob the store, to which Melanie said "They were mad. I don't know what they were doing. They were griping about a bill they had to pay."

¶26. Near the end of the call, Melanie desperately said, "Please help us. My son's not breathing, and my husband just gasps every now and then." During a pause in conversation with the dispatcher, Melanie pleaded, "Dear Father in heaven, please save them."

¶27. The jury also heard Audy's 911 call. As with Melanie, the dispatcher tried to gather information from Audy about the incident while waiting for the ambulance to arrive. The dispatcher asked Audy, "Who shot y'all?" to which he responded, "The owner of the store come in shooting like a goddamn wild man cowboy." The dispatcher attempted to clarify, "The owner of the store did?" and Audy said, "Yes, him and his son. All over $25."

¶28. Dr. Mark LeVaughn, the State's chief medical examiner, testified as to the autopsy findings on Jason and Jacob McLemore. According to Dr. LeVaughn and the autopsy reports for both Jason and Jacob, the cause of death was multiple gunshot wounds, and the manner of death was homicide. Each suffered three gunshot wounds. Jason sustained a graze wound to his hand, a shot to the abdomen, and a fatal shot to the head. Dr. LeVaughn testified that he believed the head wound instantly incapacitated Jason. Jacob sustained gunshot wounds to his right armpit, left arm, and a likely fatal wound to the chest.

¶29. At the conclusion of the State's case-in-chief, the McCools moved for a directed

8

verdict. The trial court dismissed one count of accessory after the fact as to Audy and denied the remainder of the motion. The McCools rested their case without calling any witnesses or introducing any evidence. The jury was instructed on first-degree murder and the lesser-included offenses of second-degree murder and manslaughter. Michael asserted a claim of self-defense and accordingly received a jury instruction based on this theory.

¶30. The jury found Michael guilty of two counts of second-degree murder and Audy guilty of accessory after the fact. Michael received two forty-year sentences, and Audy received a twenty-year sentence—the maximum for their respective crimes.

¶31. The duo timely appealed, raising eleven issues on appeal. For clarity, we combine some of their assignments of error.

## DISCUSSION

### I. Sufficient evidence supported Michael's second-degree-murder conviction.

¶32. The McCools argue that the evidence at trial was insufficient to convict Michael.[2] Specifically, they claim that the prosecution failed to prove every element of the crime beyond a reasonable doubt and failed to present evidence sufficient to disprove the theory of self-defense because (1) based on the number of shots fired and wounds found, it was factually impossible for Michael to have shot first; (2) Melanie's testimony lacked personal

---

[2] While the McCools classify their argument as contesting the weight of the evidence, their cited precedent addresses sufficiency of the evidence. Because the two are distinct concepts, we address each in turn.

knowledge, corroboration, and credibility; and (3) only the McCools' theory of events is supported by objective physical evidence.

¶33.    In evaluating the legal sufficiency of the evidence, "[t]he critical inquiry is whether the evidence shows beyond a reasonable doubt that the accused committed the act charged, and that he did so under such circumstances that every element of the offense existed." *Guss v. State*, 296 So. 3d 734, 737 (¶10) (Miss. Ct. App. 2020). "Under this inquiry, all evidence supporting the guilty verdict is accepted as true, and the State must be given the benefit of all reasonable inferences that can be drawn from the evidence." *Galloway v. State*, 122 So. 3d 614, 665 (¶168) (Miss. 2013). "[I]f any rational trier of fact could have found each and every one of the elements of the crime beyond a reasonable doubt, when viewing the evidence in the light most favorable to the prosecution, the verdict must stand." *Smith v. State*, 250 So. 3d 421, 424 (¶12) (Miss. 2018).

### A.    The evidence was sufficient to prove second-degree murder.

¶34.    State law defines second-degree murder as a killing "done in the commission of an act eminently dangerous to others and evincing a depraved heart, regardless of human life, although without any premeditated design to effect the death of any particular individual[.]" Miss. Code Ann. § 97-3-19(1)(b) (Rev. 2015).

¶35.    The foundational element for the crime of murder, regardless of degree, is that the killing of a human being occurred. It is undisputed that two people, Jason and Jacob, were killed.

¶36. Next we consider whether there was sufficient evidence for a jury to find that the killings were "done in the commission of an act eminently dangerous to others and evincing a depraved heart, regardless of human life." *Id*.

¶37. Michael was accused of shooting and killing Jason and Jacob. "[I]n cases involving shootings, the courts have consistently upheld convictions of depraved heart murder where the evidence suggested that the firing of a weapon was intentional, not accidental." *Steele v. State*, 852 So. 2d 78, 81 (¶12) (Miss. Ct. App. 2003).

¶38. In addition to this general rule, the jury heard the recording of Melanie's call to 911 immediately following the shooting. When asked by the 911 dispatcher whether the shooter acted intentionally, Melanie responded bluntly, "Yes, yes, he did it on purpose." Furthermore, the jury heard Corporal Lee testify that when he spoke with Michael the day of the shooting, Michael admitted to having fired his gun, while maintaining he had done so in an effort to protect himself and his father. Ballistic evidence showed that Michael's gun had been fired five times, which could support a finding that Michael fired his weapon intentionally. Given this evidence, a reasonable juror could have found beyond a reasonable doubt that Michael intentionally fired his gun, thereby acting in a manner "eminently dangerous to others and evincing a depraved heart." Miss. Code Ann. § 97-3-19(1)(b).

¶39. The final component of the second-degree-murder statute is that the killing is done "without any premeditated design to effect the death of any particular individual." *Id*. The Mississippi Supreme Court has stated that "[a] finding of malice is not required for depraved-

11

heart murder." *Swanagan v. State*, 229 So. 3d 698, 704 (¶24) (Miss. 2017). Therefore, in order to convict Michael of second-degree murder, the jury was not required to find intent to kill.

¶40. In light of the evidence presented to the jury, we find that the evidence was sufficient to prove each of the statutory elements of second-degree murder beyond a reasonable doubt.

### B. The evidence was sufficient to disprove the theory of self-defense.

¶41. Because the McCools raised the theory of self-defense, the evidence had to be sufficient for the jury to determine that Michael did not act in necessary self-defense.

### 1. Factual Impossibility

¶42. The McCools' core argument supporting their self-defense theory is that it was factually impossible for Michael to have shot first. First, they contend that Michael's six stab wounds and his gunshot wound to the head, as well as Audy's gunshot wound to the back, indicate that the McLemores were the initial aggressors.[3] The McCools also raise what seems to be a theory of mathematical impossibility, claiming that "the prosecution's case makes no logical sense" based on the number of shots fired, wounds suffered, and other

---

[3] Questions were raised at trial as to the exact cause of Michael's head wound and Audy's back wound. Yet the jury was not provided with their medical records. The photos of the McCools' wounds were taken two months after the gunfight. When pressed on cross about whether the medical records used in his investigation reflected that the McCools sustained gunshot wounds, Investigator Kristopher Robbins declined to speculate. However, Investigator Robbins did testify that he believed Michael's head injury was caused by a knife. Sergeant David Bean testified that he could not say for certain the cause of Audy's back injury. Ultimately, any dispute was for the jury to resolve.

ballistic evidence found.

¶43.    "When on appeal one convicted of a criminal offense challenges the legal sufficiency of the evidence, our authority to interfere with the jury's verdict is quite limited." *McFee v. State*, 511 So. 2d 130, 133 (Miss. 1987). It is not our duty as the appellate court to second-guess the defense's theory of impossibility as presented to the jury. Rather, the question before us is whether sufficient evidence existed such that any rational juror could find that the McCools did not act in necessary self-defense.

¶44.    The jury heard the McCools' impossibility argument at trial. Significantly, the jury also heard the following: evidence that Michael's gun had been fired five times; testimony from a ballistics expert that bullets found in the victims' bodies were consistent with having been fired from Michael's gun; and testimony from a responding officer that Michael admitted to having fired his gun.

¶45.    This evidence was sufficient for a reasonable juror to determine that Michael did not act in necessary self-defense. The question of who shot whom and when was a factual one. *See Strickland v. State*, 309 So. 3d 1090, 1095 (¶26) (Miss. Ct. App. 2020) (holding that it is the jury who weighs the evidence and not the appellate court). The jury considered the evidence and ultimately rejected the McCools' theory that it was impossible for Michael to have shot first.

### 2.    Witness Credibility

¶46.    Second, the McCools argue that, given Melanie's lack of knowledge, credibility, and

13

corroboration as the sole eyewitness, a jury could not have found the McCools guilty beyond a reasonable doubt.

¶47. Courts have long held that "[t]he weight and credibility to be given to a witness's testimony are within the sole province of the jury as fact finder." *Butler v. State*, 102 So. 3d 260, 268 (¶22) (Miss. 2012) (internal quotation marks omitted).

¶48. In attacking Melanie's credibility, the McCools claim that she lacked personal knowledge of the incident. The credibility of a witness is a matter for the jury to decide—a concept that the McCools concede in their brief. Nonetheless, the argument that Melanie lacked personal knowledge of the incident is without merit. Melanie was working at the store when the McCools arrived and was undisputedly present for the entire incident, including the moment she realized her husband and son had been shot. While Melanie admitted during trial that she did not know who shot first, she provided a number of details in her testimony that the jury could have found significant. For example, she testified at trial regarding the McCools' demeanor upon arrival and their increased hostility as time passed, which were reflected in text messages to her husband entered into evidence. She testified that Michael made threatening statements toward her and about her husband. Melanie also recalled that upon entering the store, her husband said to Michael, "Who are you cussing? If you have a problem, let's work it out." According to Melanie, Michael then "immediately attacked" Jason, starting a fight that lasted approximately ten to fifteen seconds and culminated in gunfire. She remembered being in a state of shock, realizing as her husband

14

fell backward through the glass door that he had been shot.

¶49.   The issue of Melanie's credibility was for the jury to decide, and we will not interfere with that finding on appeal.

¶50.   The McCools further argue that Melanie's statements to police were contradictory and that they were inconsistent with her testimony at trial. "When testimony at trial conflicts, it is up to the jury to determine how much weight it will afford to the testimony it hears." *Butler v. State*, 300 So. 3d 550, 560 (¶45) (Miss. Ct. App. 2020).  In addition to Melanie's testimony at trial, her statements to police, including the statement taken the day of the incident and the two subsequent interviews in the days following, were entered into evidence. It was up to the jury to consider the consistency and credibility of Melanie's statements, none of which presented meaningful contradictions.

¶51.   The McCools argue that there was "absolutely no corroboration" of Melanie's account.  As previously stated, the jury determines how much weight to afford a witness's testimony.

¶52.   Last, the McCools argue that under the *Weathersby* rule, this Court is bound to accept their version of events as true.  In that case, the Supreme Court held that "where the defendant or the defendant's witnesses are the only eyewitnesses to the homicide, their version, if reasonable, must be accepted as true, unless substantially contradicted in material particulars by a credible witness or witnesses for the [S]tate, or by the physical facts[,] or by the facts of common knowledge."  *Weathersby v. State*, 165 Miss. 207, 147 So. 481, 482

15

(1933).

¶53.   Here, the McCools were not the only eyewitnesses to the homicide. Melanie witnessed the entire altercation and testified to what she saw and experienced. Given that the *Weathersby* rule is reserved for situations in which the defendant or the defendant's witnesses are the only eyewitnesses, the rule simply does not apply here.

¶54.   Viewing the evidence presented at trial in the light most favorable to the State, we find that sufficient evidence supported Michael's conviction such that any reasonable juror could have found him guilty beyond a reasonable doubt. Michael's argument that the prosecution failed to disprove his theory of self-defense is without merit, as the jury considered all of the evidence presented and ultimately rejected the McCools' theory of events.

**II.    Sufficient evidence supported Audy's accessory-after-the-fact conviction.**

¶55.   Audy argues that the evidence presented at trial was insufficient to convict him of accessory after the fact to second-degree murder.

¶56.   When considering a sufficiency challenge, we consider whether, in viewing the evidence in the light most favorable to the prosecution, a jury could find the defendant guilty with regard to each element of the offense. *Guss*, 296 So. 3d at 737 (¶10).

¶57.   A person found to have "concealed, received, or relieved any felon," or "aided or assisted any felon, knowing that the person had committed a felony, with intent to enable the felon to escape or to avoid arrest, trial, conviction[,] or punishment after the commission of the felony" is guilty of acting as an accessory after the fact. Miss. Code Ann. § 97-1-5(1)

16

(Rev. 2015).

¶58.   The first element of the crime of accessory after the fact is that a completed felony was committed. *Mangum v. State*, 762 So. 2d 337, 342 (¶16) (Miss. 2000).  Here, the act of shooting and killing Jason and Jacob—the act for which Michael would later be convicted of second-degree murder—had been completed when Audy removed Michael's weapon from the crime scene and placed it in the McCools' car.  The prosecution put forth evidence that Michael shot and killed Jason and Jacob, and that the shooting had occurred before Audy put the gun in the car.  Namely, Michael's gun had been fired five times, and bullets recovered from the victims' bodies came from Michael's gun.

¶59.   The second element of accessory after the fact is that the accused aided or assisted the felon. *Id*.  The Mississippi Supreme Court recently decided a case in which, following a gang shooting, a defendant removed guns from a vehicle and took them to another location. *Thames v. State*, 310 So. 3d 1163, 1167 (¶9) (Miss. 2021).  The Supreme Court held that this effort to conceal and dispose of physical evidence was sufficient to support a conviction of accessory after the fact to murder. *Id*. at 1175 (¶63).

¶60.   Just as in *Thames*, the evidence indicates that Audy took steps to conceal and arguably dispose of physical evidence by removing the gun from the crime scene and placing it in the McCools' vehicle outside the store.  Sergeant Bean and Corporal Lee each testified that Michael stated that Audy had taken the gun and put it in the car following the shooting.  Corporal Lee questioned Audy as he was being loaded onto a stretcher for transport to a

17

hospital. When asked about the gun, Audy admitted to taking it from Michael and putting it in the car. These accounts are supported by investigative reports and testimony stating that Michael's Glock was found in the McCools' vehicle. Furthermore, a series of crime scene photographs show the position of the gun on the passenger floorboard of the car. Crime scene investigator Ashley Moulton testified that when she first opened the vehicle, a plastic bag was covering the gun. Moulton stated that she had to remove the bag in order to see the gun on the floorboard. In light of *Thames*, and given this proof, a rational juror could have found beyond a reasonable doubt that Audy concealed the Glock, thereby assisting or aiding Michael.

¶61. The third element of the offense of accessory after the fact is that the accused knew the principal had committed a felony. *Matula v. State*, 220 So. 2d 833, 834 (Miss. 1969). "To render one liable as an access[o]ry after the fact he must have had actual knowledge, at the time he relieved or assisted the principal, that the latter had committed a felony, or was an access[o]ry before the fact to a felony; and such knowledge must be personal as distinguished from constructive." *Id*.

¶62. We must determine whether sufficient evidence was presented to prove that Audy had actual, personal knowledge that an illegal shooting had occurred. The Mississippi Supreme Court dealt with a similar issue in *Thames*. The Court explained that the prosecution did not have to prove that the principal had been convicted of the particular felony in order to satisfy the knowledge requirement for accessory after the fact. *Thames*, 310 So. 3d at 1174 (¶57).

18

Rather, the prosecution had to prove that the defendant had, in addition to satisfying the other elements of the offense, known that the principal had "feloniously killed" the victim. *Id*. The Court determined that, "from all the substantive evidence presented, a rational juror could conclude that Thames, knowing that an illegal shooting had occurred, knowingly assisted the principals by helping to conceal and dispose of physical evidence." *Id*. at 1175 (¶63).

¶63. Evidence presented at trial indicated that Audy knew an illegal shooting had occurred. First, by all accounts, Audy was present before, during, and after the shooting. He accompanied his son to the McLemores' store and witnessed his son fire a gun toward at least two people. Audy was present when officers arrived on the scene and undisputedly had witnessed the shooting. Even if Audy believed his son had shot in necessary self-defense, that is merely a defense raised to justify the homicide. Based on the evidence presented, a rational juror could have found that Audy knew an illegal shooting had occurred.

¶64. In order to be convicted of accessory after the fact, the accused must have acted with the intent to enable the felon to avoid arrest, trial, conviction, or punishment. Miss. Code Ann. § 97-1-5(1) (Rev. 2015). The McCools argue on appeal that Audy removed Michael's gun and placed it in the car for safety reasons. Similarly, in *Thames*, the defendant claimed he ordered the removal and relocation of a vehicle involved in a drive-by shooting out of fear of retaliation from a rival gang. *Thames*, 310 So. 3d at 1173 (¶51). The Court ultimately rejected this "safety" argument, finding that the evidence was sufficient to find the defendant

19

guilty of accessory after the fact beyond a reasonable doubt with regard to each element of the offense, including the requisite intent. *Id*. at 1176 (¶66).

¶65. While Audy argues on appeal that he removed the gun for safety reasons, a jury could have rejected this argument based on the evidence—namely, that by the time Audy took the gun from Michael, everyone who had been involved in the shooting was injured and effectively incapacitated. Furthermore, Audy only removed Michael's gun, not the guns or knife carried by the McLemores.

¶66. Audy took a number of affirmative steps in order to relocate his son's gun. Immediately following the shooting, Jason and Jacob were lying dead—or nearly dead—on the floor, and Michael and Audy were injured as well. Melanie testified that when she called 911, Audy was leaning over Michael, talking to him. Michael and Audy both told responding officers that Audy took the gun from Michael. Next, Audy moved past Jacob's body in the middle of the floor and Jason, who was lying lifeless on his back, headfirst through the front door. Audy walked out the front door with his son's gun and moved toward the car. A blood stain was found on the driver's seat, indicating that Audy opened the driver's door to place the gun inside. According to Investigator Moulton's testimony and report, the gun had been placed on the passenger-side floorboard and covered with a plastic shopping bag. After covering the gun with the bag, Audy reentered the store. When considered together, this evidence was sufficient for a rational juror to determine that Audy intended to enable his son to avoid arrest, trial, conviction, or punishment.

20

¶67. In viewing all of the evidence presented at trial in the light most favorable to the prosecution, we find that the evidence was sufficient such that any rational juror could have found Audy guilty of acting as an accessory after the fact to second-degree murder beyond a reasonable doubt with regard to each element of the offense.

### III. The verdicts against Michael and Audy were not against the overwhelming weight of the evidence.

¶68. The McCools argue that their guilty verdicts were against the overwhelming weight of the evidence.

¶69. A weight-of-the-evidence challenge differs from legal sufficiency in that it seeks a new trial. *Dehart v. State*, 290 So. 3d 373, 376 (¶16) (Miss. Ct. App. 2020). "When reviewing a challenge to the weight of the evidence, the Court will disturb a jury verdict only when it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice." *Jones v. State*, 154 So. 3d 872, 880 (¶24) (Miss. 2014) (internal quotation marks omitted). Central to our analysis is the well-established concept that a jury determines matters of weight and credibility. *Dehart*, 290 So. 3d at 376 (¶19).

¶70. First we consider whether Michael's conviction of second-degree murder was against the overwhelming weight of the evidence such that allowing it to stand would constitute "an unconscionable injustice." *Jones*, 154 So. 3d at 880 (¶24).

¶71. The McCools argue that the objective evidence in this case only supports their theory of events, and therefore the jury's decision to reject their theory amounts to an

21

unconscionable injustice. Specifically, the McCools claim that (1) it was factually impossible for Michael to have shot first; and (2) Melanie's testimony lacked personal knowledge, credibility, and corroboration. Yet under our precedent the jury must decide how much weight to afford the evidence it is presented. *Dehart*, 290 So. 3d at 376 (¶19). The jury heard the McCools' trial arguments and ultimately rejected them. We will not disturb this finding on appeal.

¶72. The jury was also presented with ample evidence to support the jury's finding of guilt: testimony from Melanie recalling that Michael became increasingly belligerent and made threatening statements toward her; testimony from responding officers that Michael admitted to having fired his gun, albeit in self-defense; ballistics evidence that Michael's gun had been fired five times; and testimony that projectiles found in the victims' bodies were consistent with having been fired from Michael's gun. Perhaps most notably, the jury heard Melanie's emotional pleas for help during her 911 call, in which she also told the dispatcher that the McCools came in and "just started going nuts" and that they shot her husband and son "on purpose." Given all of this evidence, we cannot say that allowing this verdict to stand would amount to an unconscionable injustice. Therefore, the jury's decision to convict Michael of second-degree murder was not against the overwhelming weight of the evidence.

¶73. Nor was Audy's accessory-after-the-fact conviction against the overwhelming weight of the evidence. For the jury was presented with the fact that Michael and Audy each admitted to responding officers that, following the shooting, Audy had taken the gun from

22

Michael and placed it in their vehicle outside the store. Additional evidence indicated Audy's concealment of the gun. Investigator Moulton testified that, upon examination of the vehicle, she had to remove a plastic shopping bag in order to see the gun on the floorboard. She also took before-and-after photographs showing Michael's gun as initially discovered—hidden under the bag—and the exposed gun after the bag was removed. After placing his son's gun in the car outside, Audy reentered the store.

¶74.    Given this evidence, and viewing it in the light most favorable to the verdict, we find Audy's accessory-after-the-fact conviction does not constitute an unconscionable injustice.

### IV.    The jury was properly instructed.

¶75.    The McCools argue that the trial court failed to properly instruct the jury on the theory of self-defense. They also argue that the jury instructions did not sufficiently define "depraved-heart" murder and "heat-of-passion" manslaughter.

¶76.    The standard of review with regard to a trial court's decision to grant or deny a jury instruction is abuse of discretion. *Newell v. State*, 49 So. 3d 66, 73 (¶20) (Miss. 2010). In its analysis, an appellate court considers all given jury instructions to determine whether, when read as a whole, they "fairly announce the law of the case and create no injustice[.]" *Rubenstein v. State*, 941 So. 2d 735, 784-85 (¶224) (Miss. 2006). If the instructions fairly state the law and do not prejudice the defendant, reversal is not warranted. *Id*. In other words, "if all instructions taken as a whole fairly, but not necessarily perfectly, announce the applicable rules of law, no error results." *Id*.

## A. The jury was properly instructed on the theory of self-defense.

¶77. The McCools argue that the trial court improperly instructed the jury by failing to place on the State the burden of disproving the theory of self-defense. Specifically, the McCools take issue with Jury Instruction 23, which read as follows:

> The Court instructs the jury that to make a killing justifiable on the grounds of self-defense, the danger to the defendant must either be actual, present and urgent, or the defendant must have reasonable grounds to believe that the victim intended to kill the defendant or to do some great bodily harm, and in addition to this, he must have reasonable grounds to believe that there is imminent danger of such act being accomplished. It is for the jury to determine the reasonableness of the grounds upon which the defendant acts. If you, the jury, unanimously find that the defendant acted in self-defense, then it is your sworn duty to return a verdict in favor of the defendant.

The McCools claim that this instruction, on its own and when considered together with other instructions, misinformed the jury as to the State's burden of proof.

¶78. A defendant must specifically object to the proposed instruction in order to preserve the issue on appeal. *Fitzpatrick v. State*, 175 So. 3d 515, 522 (¶31) (Miss. 2015). However, failure to instruct on the essential elements of the crime is plain error. *Id*. Here, the McCools did not object to Instruction 23 at trial. Although the McCools initially proposed a different self-defense instruction—D-11, which specifically stated that the burden to disprove self-defense was on the prosecution—the McCools withdrew that instruction and agreed to accept Instruction 23 without objection. Because there was no objection to Instruction 23 reserved for appeal, this argument is procedurally barred.

¶79. Considering they did not object at trial, the McCools ask us to review for plain error.

24

The Mississippi Supreme Court has held that plain error exists "only where a fundamental right of the defendant has been violated." *Id*. In order to determine whether plain error has occurred, we must consider "(1) whether the trial court deviated from a legal rule; (2) whether the error is plain, clear, or obvious; and (3) whether the error prejudiced the outcome of the trial . . . [o]nly if the error resulted in a manifest miscarriage of justice will reversal occur." *Willie v. State*, 204 So. 3d 1268, 1279 (¶29) (Miss. 2016) (citation and internal quotation marks omitted).

¶80. We recently approved an identical instruction to Instruction 23 in *Sands v. State*, No. 2019-KA-00869-COA, 2020 WL 5793458, at *3 (¶12) (Miss. Ct. App. Sept. 29, 2020), *cert. denied*, 2021 WL 1885127, (Miss. April 29, 2021). We find, as in *Sands*, that "the trial judge did not commit any error, much less plain error, by giving this instruction." *Id*.

### B. The jury was properly instructed on depraved heart murder and heat of passion manslaughter.

¶81. The McCools argue that while the jury instructions defined "deliberate design," they failed to sufficiently define the lesser-included offenses of "depraved-heart" murder and "heat-of-passion" manslaughter, which forced the jury to speculate as to their meanings. They argue that the trial court was required to explicitly define the legal terms "depraved heart" and "heat of passion."

¶82. "A defendant's failure to object to a jury instruction at trial creates a procedural bar that prohibits appellate review of the issue, unless there is plain error." *Fitzpatrick*, 175 So. 3d at 522 (¶31). Here, the defense did not object to either of the lesser-included-offense

25

instructions on these grounds at trial. Therefore, the arguments are procedurally barred on appeal. Nonetheless, they are without merit.

### 1. "Depraved-Heart" Murder

¶83. Despite being procedurally barred on appeal, the McCools' argument that they were entitled to an instruction specifically defining "depraved heart" is unfounded. "The Mississippi Supreme Court has 'consistently held that instructions in a criminal case which follow the language of a pertinent statute are sufficient.'" *Humphries v. State*, 18 So. 3d 305, 308 (¶14) (Miss. Ct. App. 2009) (quoting *Crenshaw v. State*, 520 So. 2d 131, 135 (Miss. 1988)). Based on this rule, we have held that a trial judge is not required to give an additional instruction defining "depraved heart." *Nichols v. State*, 27 So. 3d 433, 440 (¶22) (Miss. Ct. App. 2009).

¶84. State law defines second-degree murder as "[t]he killing of a human being . . . done in the commission of an act eminently dangerous to others and evincing a depraved heart, regardless of human life, although without any premeditated design to effect the death of any particular individual." Miss. Code Ann. § 97-3-19(1)(b). Containing almost identical language to the statute, Jury Instructions 19 and 21, to which the defense now takes issue, stated the following:

> Second degree murder is the killing of a human being, done in the commission of an act eminently dangerous to others and evincing a depraved heart, regardless of human life, although done without any premeditated design to effect the death of any particular individual, and not in necessary self defense.

Jury Instructions 19 and 21 defined the elements of depraved-heart murder according to state

26

law. Miss. Code Ann. § 97-3-19(1)(b). Because the instructions at issue closely follow the language of the relevant statute, an additional defining instruction was not necessary. Failure to give such an instruction did not constitute reversible error.

## 2. "Heat-of-Passion" Manslaughter

¶85. The McCools' argument that the "heat-of-passion" manslaughter instruction required further definition is without merit. The Mississippi Supreme Court has held that it is not reversible error or plain error not to give an instruction defining "heat of passion." *Bernard v. State*, 288 So. 3d 301, 312 (¶42) (Miss. 2019).

¶86. Furthermore, the McCools' argument lacks merit because the jury did not reach the lesser-included offense of manslaughter in its analysis. The circuit court instructed the jurors that if they could not find beyond a reasonable doubt that Michael committed deliberate-design murder, they should next consider whether Michael committed second-degree murder. The jury ultimately convicted Michael of second-degree murder, indicating that it did not reach consideration of the lesser-included offense of manslaughter.

¶87. The Mississippi Supreme Court has stated that "instructions may be made more perfect does not mean they are legally inadequate." *Turner v. State*, 573 So. 2d 1340, 1343 (Miss. 1990). As long as the instructions, when read as a whole, accurately state the law and do not create injustice, reversal is not warranted. *Rubenstein*, 941 So. 2d at 784 (¶224). The instructions in this case, when read in their entirety, accurately stated the law.

## V. The sentences do not constitute cruel and unusual punishment.

¶88. The McCools argue that Michael's two consecutive forty-year sentences for his convictions of two counts of second-degree murder and Audy's twenty-year sentence for his accessory-after-the-fact conviction are grossly disproportionate and otherwise excessive under the Eighth Amendment.

## A. The sentences are within the statutory range.

¶89. "A sentence within the limits prescribed by statute is not ordinarily subject to appellate review." *Portis v. State*, 245 So. 3d 457, 474 (¶44) (Miss. 2018).

¶90. The jury convicted Michael of two counts of second-degree murder. The sentence for a person convicted of second-degree murder was "not less than twenty (20) nor more than forty (40) years" if the jury did not impose life imprisonment. Miss. Code Ann. § 97-3-21(2). Michael received two forty-year sentences—one for each count—which was the maximum allowed under statute.

¶91. Audy was sentenced to twenty years. Accessory after the fact carried a sentence of "a period not to exceed twenty (20) years" if the corresponding felony was a violent crime for which "the maximum punishment was life, death or twenty (20) years or more." Miss. Code Ann. § 97-1-5(1)(a)(i) (Rev. 2015). Audy's sentence was within the statutory requirement.

¶92. The sentences of both Michael and Audy were within the periods authorized by statute. While sentences within the statutory range are generally not disturbed on appeal, there is "a very limited and rarely imposed exception to the general rule." *Nash v. State*, 293

28

So. 3d 265, 268 (¶12) (Miss. 2020).

### B.     The sentences are not grossly disproportionate to the crimes.

¶93.    "The Eighth Amendment, which forbids cruel and unusual punishments, contains a narrow proportionality principle that applies to noncapital sentences." *Ewing v. California*, 538 U.S. 11, 20 (2003) (internal quotation marks omitted).  The United States Supreme Court has stated that "the Eighth Amendment does not require strict proportionality between crime and sentence," but rather "forbids only extreme sentences that are grossly disproportionate to the crime." *Id.* at 23 (internal quotation marks omitted).  The Mississippi Supreme Court has applied this narrow proportionality principle accordingly.  *See Nash*, 293 So. 3d at 270 (¶17) (holding that a sentence of twelve years for possession of a cell phone by an inmate in a correctional facility was not grossly disproportionate to the crime).  "[T]o determine if a particular sentence is grossly disproportionate, a court must first compare the gravity of the offense to the severity of the sentence." *Id*. at 269 (¶13).

¶94.    In arguing that their sentences violated the Eighth Amendment, the McCools note that both Michael and Audy were hurt in the conflict and that their sentences effectively amounted to life sentences due to their life expectancies.  Yet the McCools cite no case law supporting their contention that their respective sentences were grossly disproportionate or otherwise excessive.

¶95.    There is no doubt that the McCools' crimes were severe.  Michael was found guilty on two counts of second-degree murder for the shooting death of a teenage boy and his

29

father. The jury convicted Audy of accessory after the fact to second-degree murder for removing Michael's gun following the shooting. Both received the maximum penalty under state law for their crimes.

¶96. The Mississippi Supreme Court has upheld sentences in cases where the record indicated that the trial judge exercised discretion in imposing the sentence. *Ford v. State*, 975 So. 2d 859, 870 (¶40) (Miss. 2008) (holding that a sentence of seventeen years for aggravated assault did not give rise to an inference of gross disproportionality). The Supreme Court even upheld the sentence despite the fact that the trial judge denied the request for a presentence investigation, since based on the record the trial judge had expressed concerns about the severity of the crime. *Id*. at (¶42).

¶97. Here, the record shows that the trial judge weighed a number of factors before imposing the sentences. Before sentencing Michael, the judge explained the various sources of information that contributed to his decision. First, he noted that he sat through the entire trial and observed Michael's demeanor and the evidence. He reviewed the presentence investigation report several times. Additionally, the trial judge reviewed letters and heard testimony from the victims' and the defendants' families. He also heard from Michael himself prior to sentencing. With all of this in mind, the trial judge ordered Michael to serve two separate consecutive forty-year sentences.

¶98. The trial judge also considered ample information before sentencing Audy. He stated that, as with Michael, he observed Audy and the evidence at trial and heard from the victims'

family, as well as Audy and his family. He also reviewed the presentence report multiple times. Notably, the trial judge stated that he took into account Audy's past, as well as the fact that Audy is a father and "what a father would have done in those circumstances." The judge discussed the evidence that supported Audy's conviction. Given this, he sentenced Audy to twenty years in the custody of the Mississippi Department of Corrections, with fourteen years to serve and the remaining six years under post-release supervision.

¶99. With regard to both Michael and Audy, the initial comparison of the sentence to the severity of the crime does not give rise to an inference of disproportionality. Therefore, no further analysis is required. The sentences of Michael and Audy are affirmed.[4]

### VI. The ineffective-assistance-of-counsel claim is not appropriate for direct appeal.

¶100. The McCools argue ineffective assistance of counsel by their trial attorney. Specifically, they argue that counsel's failure to acquire and introduce vital forensic, medical, and DNA evidence, and to complete tasks for which he had already received payment, amounted to a violation of the McCools' Sixth Amendment right to counsel. They also cite counsel's decision not to give an opening argument as a reason for ineffectiveness.

¶101. "Ineffective-assistance-of-counsel claims should ordinarily be raised in a motion for

---

[4] To some extent, the McCools also challenge whether the trial court had jurisdiction to reconsider their sentences. "Our review of motions to reconsider a sentence is made under an abuse-of-discretion standard." *Ducote v. State*, 970 So. 2d 1309, 1312 (¶6) (Miss. Ct. App. 2007). After finding it lacked jurisdiction to hear the motion for reconsideration, the trial court proceeded to consider the McCools' argument that their sentences were grossly disproportionate. The trial court's denial was not an abuse of discretion.

31

post-conviction relief, not on direct appeal." *Hamlin v. State*, 306 So. 3d 843, 844 (¶2) (Miss. Ct. App. 2020).[5] "The Court will address such claims on direct appeal when (1) the record affirmatively shows ineffectiveness of constitutional dimensions, or (2) the parties stipulate that the record is adequate, and the appellate court determines that the findings of fact by a trial judge able to consider the demeanor of witnesses, etc., are not needed." *Id*.

¶102. Here, the parties did not stipulate that the record is adequate to consider the ineffective-assistance claim. The majority of the McCools' arguments regarding ineffective assistance are not based in the record. "This Court will not consider matters that do not appear in the record, and it must confine its review to what appears in the record." *Pulphus v. State*, 782 So. 2d 1220, 1224 (¶15) (Miss. 2001). Some of the McCools' arguments are based on information simply attached to their briefs, and will therefore not be considered. "Attaching documents to briefs or including them in record excerpts does not make them a part of the certified record as required by Mississippi Rule of Appellate Procedure 10, and so they will not be considered." *Jones v. Jones*, 307 So. 3d 1229, 1231 (¶7) (Miss. Ct. App. 2020).

¶103. Because the parties did not stipulate that the record is adequate to determine whether the McCools received ineffective assistance from their trial attorney, and because the record does not affirmatively show ineffective assistance rising to the level of a constitutional

___

[5] In both their brief and oral argument, counsel for the McCools admitted that ineffective-assistance-of-counsel claims are more appropriately brought in a motion for post-conviction relief.

violation, the McCools' claim is not appropriately brought on direct appeal and should be raised in a motion for post-conviction collateral relief.

### VII. There is no cumulative error.

¶104. Finally, the McCools argue that the alleged errors in the trial court proceedings combined to effectively deprive them of their fundamental right to a fair trial and that, therefore, reversal is required. The Mississippi Supreme Court has held that "individual errors, not reversible in themselves, may combine with other errors to make up reversible error." *Wilburn v. State*, 608 So. 2d 702, 705 (Miss. 1992). "The question under these and other cases is whether the cumulative effect of all errors committed during the trial deprived the defendant of a fundamentally fair and impartial trial." *Id*.

¶105. Typically, where "there was no reversible error in any part . . . there is no reversible error to the whole." *McFee*, 511 So. 2d at 136. There was no error in this case, and so there is no merit to this argument.

### CONCLUSION

¶106. We find that sufficient evidence supported Michael's second-degree murder convictions and Audy's accessory-after-the-fact conviction, and that the jury verdicts were not against the overwhelming weight of the evidence. We also find that the jury was properly instructed on the theory of self-defense and on the lesser-included offenses of depraved-heart murder and heat-of-passion manslaughter. The sentences did not constitute cruel and unusual punishment. We find that the McCools' ineffective-assistance-of-counsel

claim is not appropriately brought on direct appeal.  Finally, the cumulative effect of the

alleged errors did not deprive the McCools of a fair trial.  For these reasons, we affirm.

¶107.  **AFFIRMED.**

      **BARNES, C.J., CARLTON AND WILSON, P.JJ., GREENLEE, WESTBROOKS, McDONALD, LAWRENCE, SMITH AND EMFINGER, JJ., CONCUR.**