# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2021-KA-00240-SCT

*TAJARVIS HAYMON AND CRYSTAL PERNELL*

*v.*

*STATE OF MISSISSIPPI*

DATE OF JUDGMENT:                       12/09/2020
TRIAL JUDGE:                            HON. BARRY W. FORD
TRIAL COURT ATTORNEYS:                  AKILLIE MALONE OLIVER
                                        SHARON ALGENA SPENCER
                                        ALVA PEYTON TAYLOR
                                        PEARLENE JONES
COURT FROM WHICH APPEALED:              HOLMES COUNTY CIRCUIT COURT
ATTORNEYS FOR APPELLANTS:               ALVA PEYTON TAYLOR
                                        PEARLENE JONES
ATTORNEY FOR APPELLEE:                  OFFICE OF THE ATTORNEY GENERAL
                                        BY:  ALLISON HORNE
DISTRICT ATTORNEY:                      AKILLIE MALONE OLIVER
NATURE OF THE CASE:                     CRIMINAL - FELONY
DISPOSITION:                            AFFIRMED - 09/01/2022
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

**BEFORE KITCHENS, P.J., MAXWELL AND CHAMBERLIN, JJ.**

**CHAMBERLIN, JUSTICE, FOR THE COURT:**

¶1.     Crystal Pernell and Tajarvis Haymon were convicted of two counts of armed robbery (Counts I and II), kidnapping (Count III) and aggravated assault (Count IV).  On appeal, Pernell challenges the weight and sufficiency of the evidence used to support her conviction and argues that her request for a lesser offense jury instruction for simple assault should have been granted.  Haymon argues that Danzel Williams's (Danzel) identification of him in a

photo lineup was impermissibly suggestive.  Finding no error, we affirm.

## FACTS AND PROCEDURAL HISTORY

¶2.     On March 20, 2013, Danzel Williams (Danzel) was working on his car at his brother's house in Durant when he received a text message from Crystal Pernell asking him to come "chill."  Pernell and Danzel had been frequently meeting and having sex with one another for more than a year.  For these meetings, Danzel would usually drive to Pernell's house and park, although sometimes Danzel would pick up Pernell, and they would drive to different locations.   Pernell proceeded to send Danzel a series of text messages throughout the day, as she usually did, insisting that he come to her house that evening and, on this occasion, that he bring cigars. Importantly, at this time, Pernell had a boyfriend, Tajarvis Haymon.

¶3.     Before dark, Danzel borrowed his mother's car and drove to Pernell's aunt's house in West, where Pernell was residing.  Pernell's aunt's house was at the end of a dead-end road and had a long driveway.  Pernell was waiting in the driveway when Danzel arrived at the house, and Pernell directed him to park in their usual spot in "the cut."  Pernell and Danzel sat in the front seat of the car and talked.  Eventually, it was agreed that they should move to the back seat of the car.[1]

¶4.     As Danzel was getting out of the car, two men dressed in black with black hoodies and black face coverings jumped out of the bushes near the car.  One of the men hit Danzel in the eye, ear and back of the head with a pistol.  Danzel fell to the ground and was held

---

[1]Danzel's testimony was inconsistent as to who initiated the move to the back seat. In his initial statement to the police the day after the crime, Danzel stated that Pernell said they should get in the back seat.  At trial, Danzel testified that he was the first to mention moving to the back seat.

down and searched by the two men. Pernell stayed in the front seat of the car during the beginning of the attack and at some point went back into her house.[2] The two men repeatedly asked Danzel where his money and gun were located. When neither money nor guns were found, one of the attackers allegedly said, "oh I know where it at" and threw Danzel into the back seat of his mother's car. One man took the driver's seat and the other sat in the back seat holding a gun to Danzel's head.

¶5.    When they approached Durant, the assailants lowered their masks so as not to arouse suspicion.[3] At this point, Danzel was able to see the driver's face through the reflection in the rearview mirror and recognized him as Chub, who was one of Pernell's relatives that he had known for many years. As they drove through town, Danzel testified he was able to glance up at the face of the man holding a gun to his head and identify him as Pernell's boyfriend.

¶6.    Chub drove the car to where Danzel was staying in Durant. Chub took the gun from Pernell's boyfriend and followed Danzel to the house to get the money. Danzel went inside. When Danzel returned outside to give the money to Chub, he was able to look directly into Chub's face and recognize him by his cheekbones and hair. Danzel gave them $350 and ran back inside the house to alert his mother. Chub and Pernell's boyfriend rode away in Danzel's mother's car. Later that evening, Danzel gave a summary statement to the police;

---

[2]There are differing opinions as to the speed at which Pernell left the scene, whether she ran or walked, but it was agreed that she left.

[3]Once again, Danzel's testimony was inconsistent as to whether Danzel said, "y'all take your mask off so nobody won't suspect nothing" or whether the driver made the comment.

he reported that Pernell's boyfriend and brother [4] had robbed him. Then, Danzel went to the hospital for treatment of his injuries.

¶7.     On March 21, 2014, Danzel gave a full statement to the police and was presented a photo lineup; he identified Jamarcus Williams[5] as Chub and Tajarvis Haymon as Pernell's boyfriend. Also on March 21, the day after the crimes, Conola Logan, a truck stop employee, saw Pernell, Haymon and Jamarcus riding together in the stolen vehicle. Surveillance camera footage showing Pernell, Haymon and Jamarcus at the truck stop was introduced as an exhibit at trial. The vehicle was later discovered in a locked and gated backyard behind Pernell's aunt's house.

¶8.     At trial on October 19, 2020, Danzel identified Pernell and Haymon from the witness stand. The jury found Pernell guilty of two counts of armed robbery, one count of kidnapping and one count of aggravated assault. The jury found Haymon guilty of two counts of armed robbery, one count of kidnapping and one count of aggravated assault.

¶9.     For Count I armed robbery, Pernell was sentenced to twenty years in the Mississippi Department of Corrections, with five years to serve, with credit for time already served, fifteen years suspended and five years' supervised probation. For Count II armed robbery, Pernell was sentenced to twenty years in the Mississippi Department of Corrections, with five

---

[4]Danzel's personal written summary statement from the night of the crime did not include this identification, but it was recorded by the officer in the incident report that was based on Danzel's report. At trial, Danzel testified that his summary statement had been quickly written because he was trying to get to the hospital. Additionally, at trial, testimony established Chub as Pernell's cousin not her brother.

[5]Jamarcus Williams was not prosecuted in this trial and is currently incarcerated for different crimes.

4

years to serve, with credit for time already served, fifteen years suspended and five years' supervised probation. For Count III kidnapping, Pernell was sentenced to twenty years in the Mississippi Department of Corrections, with five years to serve, with credit for time already served, and fifteen years suspended. For Count IV aggravated assault, Pernell was sentenced to ten years suspended, with credit for time already served. Pernell's two armed robbery sentences and kidnapping sentence were ordered to run concurrently. Her aggravated assault sentence was ordered to run consecutively with the armed robbery and kidnapping sentences.

¶10. For Count I armed robbery, Haymon was sentenced to twenty years in the Mississippi Department of Corrections, with ten years to serve and ten years suspended with credit for time already served. For Count II armed robbery, Haymon was sentenced to twenty years in the Mississippi Department of Corrections, with ten years to serve and ten years suspended, with credit for time already served. For Count III kidnapping, Haymon was sentenced to twenty years in the Mississippi Department of Corrections, ten years to serve and ten years suspended pending good behavior. For Count IV aggravated assault, Haymon was sentenced to twenty years suspended. The aggravated assault sentence was ordered to run consecutively to the two armed robbery sentences and single kidnapping sentence. The armed robbery and kidnapping sentences were ordered to run concurrently.

## ISSUES PRESENTED

¶11. On appeal Pernell argues:

I. Whether the trial court erred by denying Defendant's motion for directed verdict and/or a new trial.

II. Whether the trial court erred when it failed to grant Defendant's

5

request for a lesser included offense jury instruction for simple assault.

¶12. On appeal Haymon argues:

III. Whether the trial court erred by failing to grant Haymon's motion to suppress the photo identification lineup.

## DISCUSSION

**I. Whether the trial court erred by denying Defendant's motion for directed verdict and/or a new trial.**

¶13. Pernell argues that the State did not present evidence of any action or conduct indicating that Pernell planned the offenses; therefore, she argues, the trial court abused its discretion by denying the motion for directed verdict or a new trial.

*A. Sufficiency of the Evidence*

¶14. An appeal of the trial court's denial of a directed verdict or judgment notwithstanding the verdict is a challenge to the sufficiency of the evidence that is subject to a de novo standard of review. *Gilmer v. State*, 955 So. 2d 829, 833 (Miss. 2007) (citing *Ivy v. State*, 949 So. 2d 748, 751 (Miss. 2007)). In reviewing the sufficiency of the evidence, this Court views all evidence in the light most favorable to the State and will reverse and render judgment in favor of the defendant "only if the facts and inferences 'point in favor of the defendant on any element of the offense with sufficient force that reasonable men could not have found beyond a reasonable doubt that the defendant was guilty . . . .'" *Young v. State*, 119 So. 3d 309, 313 (Miss. 2013) (internal quotation marks omitted) (quoting *Hughes v. State*, 983 So. 2d 270, 275-76 (Miss. 2008)).

¶15. Pernell was convicted as a principal. Pursuant to Mississippi Code Section 97-1-3

(Rev. 2020), "[e]very person who shall be an accessory to any felony, before the fact, shall be deemed and considered a principal and shall be indicted and punished as such[.]"  This Court has held that "[a]ny person who is present at the commission of a criminal offense and aids, counsels, or encourages another in the commission of that offense is an 'aider and abettor' and is equally guilty with the principal offender." *Jones v. State*, 710 So. 2d 870, 874 (Miss. 1998) (internal quotation marks omitted) (quoting *Hoops v. State*, 681 So. 2d 521, 533-34 (Miss. 1996), *abrogated on other grounds by Willis v. State*, 300 So. 3d 999 (Miss. 2020)).  Additionally, "[t]his Court defined accessory before the fact as 'one who procures, counsels or commands another to commit a felony for him, but is not himself present, actually or constructively, when the felony is committed.'" *Johnson v. State*, 290 So. 3d 1232, 1237 (Miss. 2020) (quoting *Huff v. Edwards*, 241 So. 2d 654, 657 (Miss. 1970)). "The difference between the two is that an aider or abettor, 'is actually or constructively present at the offence,' while an accessory before the fact is not." *Willis*, 300 So. 3d at 1007 (citing *Dilworth v. State*, 909 So. 2d 731, 734 (Miss. 2005), *disagreed with by Clark v. State*, 315 So. 3d 987, 1004 (Miss. 2021)).  The State argues that, under either theory, sufficient evidence was presented to support the conviction.

¶16.    The evidence against Pernell is largely circumstantial; no direct evidence was introduced at trial to prove any specific facts as to how Pernell and Haymon planned the commission of the crime. However, "[d]irect evidence is unnecessary to support a conviction so long as sufficient circumstantial evidence exists to establish guilt beyond a reasonable doubt." *Campbell v. State*, 798 So. 2d 524, 528 (Miss. 2001) (internal quotation marks

7

omitted) (quoting *Underwood v. State*, 708 So. 2d 18, 35 (Miss. 1998)). Additionally, this Court recently reaffirmed the principle that "circumstantial evidence is given the same weight as direct evidence" and there is no heightened burden of proof for circumstantial evidence. *Nevels v. State*, 325 So. 3d 627, 629, 632 (Miss. 2021).

¶17.    Pernell contends that her presence alone at the scene of the crime and knowledge that a crime was being committed is insufficient to prove her guilt. *See Milano v. State*, 790 So. 2d 179, 185 (Miss. 2001) ("[M]ere presence at the scene of a crime and knowledge that a crime is being committed are not sufficient to establish that a defendant either directed or aided and abetted the crime unless you find beyond a reasonable doubt that the defendant was a participant and not merely a knowing spectator."). Pernell cites *Swinford v. State*, 653 So. 2d 912 (Miss. 1995), to support her claim that there is insufficient evidence to support her conviction. In *Swinford*, Darla Jo Swinford cheated on her boyfriend, George Johnson, Jr., with Jamie Medlin while Johnson was on a trip to Florida. *Id.* at 913. When Johnson returned from his trip and learned of Swinford's new relationship, he asked her to set up a meeting between him and Medlin so that they could talk. *Id.* at 914. Swinford arranged the meeting, and at the meeting Swinford watched Johnson kill Medlin. *Id.* Johnson, Swinford, and one of Johnson's friends then drove to Florida. *Id.* Swinford was eventually arrested in Florida and brought back to Mississippi, where she was convicted of murder. *Id.*

¶18.    On appeal, Swinford challenged the sufficiency of the evidence, arguing that the State failed to show that she participated in the murder as an aider and abettor by "an overt act of assistance or by an oral expression of encouragement." *Id.* However, this Court found that

8

sufficient evidence supported the conviction. Undisputed evidence was presented at trial that Johnson killed Medlin, that Swinford was present at the time of the killing and that Swinford arranged for the meeting where the killing took place. *Id.* at 915. Additionally, this Court considered that Swinford testified that she suspected trouble, yet "[s]he neither tried to stop the discussion or leave for help." *Id.* "Swinford testified that she only thought that Johnson wanted to talk to Medlin on the day of the murder and that she traveled to Florida with the boys out of fear." *Id.* But this Court found that Swinford's testimony was directly refuted by other evidence and testimony presented at trial. *Id.* This Court held that there was sufficient evidence to affirm the conviction of murder. *Id.*

¶19. *Swinford* is similar to the present case; Pernell argues that the State has presented no evidence that she acted in concert with, conspired, planned, participated or encouraged the commission of the crime. The facts of this case are similar to *Swinford*. Pernell arranged the meeting at which Danzel was beaten and robbed by her boyfriend and cousin. Just as Swinford was aware a crime was being committed and did nothing to help, Pernell knew Danzel was being beaten and did not call for help. *Id.* Regarding Pernell's involvement, Danzel testified that "she was the brain" behind the crime and that she had tricked him into coming to her house in order for the robbery to occur. Although Danzel and Pernell had been seeing one another for more than a year, there was no set schedule or pattern for when these meetings would take place. Pernell greeted Danzel in the driveway and directed him to park in "the cut." Pernell remained in the front seat while Danzel was getting out of the car, and she left the scene while Danzel was being attacked. Also, there is no evidence that the

9

attackers prevented her from leaving or spoke to her in any manner. Pernell was seen the following day riding in the stolen vehicle, which was later recovered in the backyard of the house in which she was living.

¶20. Pernell argues that the failure to report a crime is insufficient for an individual to be held criminally liable for its commission. Pernell does not cite any case law to support this claim. However, just as in *Swinford*, a reasonable jury could consider Pernell's failure to call for help as circumstantial evidence of Pernell's involvement in the crime. *See Swinford*, 653 So. 2d at 915.

¶21. This Court has overturned convictions when evidence failed to show that the defendant was aware of his companions' activities prior to the actual commission of the crime and when no reasonable inference from other evidence showed any such knowledge by the defendant. *Gangl v. State*, 612 So. 2d 333, 336 (Miss. 1992). Evidence in this case demonstrates a reasonable inference that Pernell was aware of the actual commission of the crime. Danzel testified that but for Pernell's inviting him to her aunt's house that evening, he would not have been there. The house was in a rural area of West at the end of a dead end road and was, therefore, isolated. Pernell expressed no shock or surprise at the attack, and she was not attacked or restricted from leaving the scene. Pernell simply left Danzel and did nothing further to assist him or call for help. Additionally, Pernell's riding in the car the following day with the assailants in a friendly manner and the discovery of the stolen vehicle in a locked backyard at the house where she resided is circumstantial evidence that indicates that Pernell intended to assist in the commission of the crime.

10

¶22. Pernell's claim that she was merely a passenger in the car is directly refuted by the evidence and testimony that she was an aider an abettor. At trial, the jury was presented with Pernell's argument that she was a passenger in the car who knew nothing of the crimes but nevertheless found her guilty. Viewing the evidence in the light most favorable to the State, this Court finds that the facts and inferences are sufficient to support a rational jury's finding that Pernell was a participant in the commission of the crimes.

### B. Weight of the Evidence

¶23. Pernell requests a new trial. A request for a new trial is a challenge to the weight of the evidence. *Ivory v. State*, 283 So. 3d 108, 117 (Miss. 2019). The trial court's grant or denial of a new trial is reviewed under an abuse of discretion standard, and the evidence is viewed in the light most favorable to the verdict. *Little v. State*, 233 So. 3d 288, 292 (Miss. 2017). This Court will overturn a jury verdict "only when it is so contrary to the evidence presented that to let it stand would sanction an unconscionable injustice." *Wilson v. State*, 936 So. 2d 357, 363 (Miss. 2006) (citing *Bush v. State*, 895 So. 2d 836, 844 (Miss. 2005), *abrogated on other grounds by Little*, 233 So. 3d at 291).

¶24. The State cites *Ivory* to support its contention that Pernell has waived this challenge because she failed to make an argument as to the weight of the evidence in her post trial motion. In *Ivory*, the defendant's attorney filed a motion for judgment not withstanding the verdict but argued the conviction was against the weight of the evidence. *Ivory*, 283 So. 3d at 116. This Court refused to allow Ivory to "recharacterize the style or substance of the motion" to include a request for a new trial or a challenge to the weight of the evidence. *Id.*

at 117. Therefore, the Court held that Ivory had failed to preserve a challenge to the weight of the evidence. *Id.*

¶25. *Ivory* is distinguishable because Pernell moved post-trial for judgment notwithstanding the verdict or, in the alterative, a new trial. Pernell's request for a new trial in her post-trial motion was sufficient to preserve the weight of the evidence issue for appeal.

¶26. The jury was presented with the facts that Pernell initiated the meeting on the night of the crime, met Danzel in the driveway, directed him on where to park, stayed in the front seat while Danzel got out of the car, left the scene during the assault and took no other action to help. Danzel testified that Haymon and Jamarcus were completely focused on him and did not bother Pernell at all. Danzel testified that he noticed Pernell was gone from the front seat of the car when he was forced into the back seat at gunpoint. Pernell had a relationship with the attackers; Haymon was her boyfriend, and Jamarcus was her cousin. Additionally, she was seen the following day at a convenience store riding in the stolen car with Haymon and Jamarcus. The car was eventually discovered in the back yard of the house where she was staying. The jury's verdict was not against the overwhelming weight of evidence, and the trial court did not abuse its discretion by denying a new trial.

II. **Whether the trial court erred when it failed to grant Defendant's request for a lesser included offense jury instruction for simple assault.**

¶27. This Court reviews a trial court's grant or denial of a request for a lesser offense jury instruction de novo. *Gilmore v. State*, 119 So. 3d 278, 286 (Miss. 2013) (citing *Downs v. State*, 962 So. 2d 1255, 1258 (Miss. 2007)). "To warrant the lesser-included offense

instruction, a defendant must point to some evidence in the record from which a jury could reasonably find him not guilty of the crime with which he was charged and at the same time find him guilty of a lesser-included offense." *Goodnite v. State*, 799 So. 2d 64, 69 (Miss. 2001) (citing *Toliver v. State*, 600 So. 2d 186, 192 (Miss. 1992)).

¶28. Pernell was convicted of aggravated assault under Mississippi Code Section 97-3-7 which states, in part, that "[a] person is guilty of aggravated assault if he or she . . . (ii) attempts to cause or purposely or knowingly causes bodily injury to another with a deadly weapon or other means likely to produce death or serious bodily harm[.]" Miss. Code Ann. § 97-3-7(2)(a) (Rev. 2020). This Court has stated that "it [is not] necessary under this section for the State to prove the victim suffered 'serious' bodily injury. Mere 'bodily injury' is sufficient so long as it was caused with 'other means likely to produce death or serious bodily harm.'" *Jackson v. State*, 594 So. 2d 20, 24 (Miss. 1992) (quoting Miss. Code Ann. § 97-3-7(2)(a) (Supp. 1991)). Danzel was hit in the head, ear and eye with a deadly weapon—a gun. Pernell argues a simple assault jury instruction should have been included because the nurse practitioner who examined Danzel on the night of the crime testified that Danzel injuries were not deadly. Pernell's argument is incorrect because the State was not required to prove Danzel's injuries were deadly, only that he sustained bodily injury by use of a deadly weapon. *See* Miss. Code. Ann. § 97-3-7(2)(a). Using a gun to beat Danzel satisfied the statutory requirements. The jury could not have found Pernell guilty of a lesser offense than aggravated assault because it is not disputed that Danzel was assaulted with a deadly weapon. Thus, the trial court did not err by denying a jury instruction for simple assault.

### III. Whether the trial court erred by failing to grant Haymon's motion to suppress the photo identification lineup.

¶29. This "Court will not disturb a lower court's decision on the suppression of evidence unless 'there is an absence of substantial credible evidence supporting it.'" ***Butler v. State***, 102 So. 3d 260, 264 (Miss. 2012) (quoting ***Gray v. State***, 728 So. 2d 36, 68 (Miss. 1998), *abrogated on other grounds by* ***Franklin v. State***, 170 So. 3d 481, 487 (Miss. 2015)). Haymon argues that the photo lineup was suggestive and that the procedure used by the police generated an impermissibly tainted, inaccurate and unreliable out-of-court and in-court identification of Haymon. The State argues that the trial court correctly denied Haymon's motion to suppress because Danzel knew his attackers before the presentation of the lineup. The evidence shows that Danzel repeatedly stated that he recognized Haymon and Jamarcus on the night of the crime.

¶30. When evaluating the admissibility of a pretrial identification, this Court "must first determine whether the identification process was unduly suggestive. And even if it was, the court has the right to admit the identification if it determines that the out-of-court identification was nevertheless so reliable that no substantial likelihood of misidentification existed." ***Latiker v. State***, 918 So. 2d 68, 74 (Miss. 2005) (citing ***Neil v. Biggers***, 409 U.S. 188, 198, 93 S. Ct. 375, 34 L. Ed. 2d 401 (1972)).

#### A. The photo lineup was not unduly suggestive.

¶31. Haymon argues that an officer provided Danzel with his name, which tainted the identification procedure. "A lineup or series of photographs is impermissibly suggestive if 'the accused, when compared with the others, is conspicuously singled out in some manner

from the others, either from appearance or statement by an officer[.]" ***Butler***, 102 So. 3d at 264 (alteration in original) (quoting ***York v. State***, 413 So. 2d 1372, 1383 (Miss. 1982)).

¶32.    Officer Mitchell, the officer who conducted the photo lineup, testified that the purpose of giving Danzel a photo identification line up was to allow Danzel to match the nicknames to faces so the deputies could discover the suspect's legal names. Undoubtedly the officers supplied the names of the suspects to Danzel because he reported that Big Chub and T.J. had attacked him, but he did not know their legal names. On direct examination at trial Danzel testified as follows:

> Q So Mr. Williams would it be correct based off of what you just said, that at the time that they showed you the pictures, you had already told them who the people were, that had robbed you, is that correct?
>
> A Yes, ma'am.
>
> Q But you told them their nicknames, not their real names?
>
> A Yes
>
> Q But you told them who they were?
>
> A Yes, ma'am.
>
> Q Would it be correct to say that the pictures was just so that they could know who you was talking about, by the nickname?
>
> A Yes, ma'am.

Additionally, Officer Mitchell testified at trial that the names came from Danzel based on his positive identification of the two suspects. Officer Mitchell denied that Haymon's name was given to Danzel prior to the lineup and stated that the officers knew the names but that Danzel did not at the time of the photo lineup. The officers' providing of the names of the

suspects to Danzel based on the photos chosen from a lineup did not taint the identification procedure because Danzel had already identified Haymon and Jamarcus.

¶33. Haymon also argues that the photo lineup was suggestive because he and Jamarcus were the only two people with shorter deadlocks and hoodie jackets and because a fire alarm was visible in the top left corner of the picture. As to the potentially distinguishable features in the pictures, Danzel testified, "what difference does it make. I still know who it is, their hair or without the hoodie." An out-of-court identification will be excluded if the "identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Biggers*, 409 U.S. at 197 (internal quotation mark omitted) (quoting *Simmons v. United States*, 390 U.S. 377, 384, 88 S. Ct. 967, 19 L. Ed. 2d 1247 (1968)). Danzel was able to see Haymon and Jamarcus in the car and at the house, and he knew them, making the likelihood of irreparable misidentification slim to none.

¶34. Nevertheless, the features that Haymon takes issue with are not so distinct as to cause the entire lineup to be tainted. This Court has held that lineups are impermissibly suggestive when the defendant is "the only one depicted with a distinctive feature[.]" *Bankston v. State*, 391 So. 2d 1005, 1008 (Miss. 1980) (when defendant was the only person with a mustache that matched the victim's description of the suspect, lineup impermissibly suggestive). However, this Court has also found that "'minor differences' with the suspects or differences in the photograph backgrounds will not render a lineup impermissibly suggestive." *Latham v. State*, 299 So. 3d 768, 774 (Miss. 2020) (quoting *Butler*, 102 So. 3d at 265); *see Jones v.*

16

*State*, 504 So. 2d 1196, 1199 (Miss. 1987) (lineup not impermissibly suggestive when defendant was the only person in the lineup wearing a baseball cap); *White v. State*, 507 So. 2d 98, 99 (Miss. 1987) (lineup not impermissibly suggestive when defendant was the only person with plaited hair and forehead tattoos); *Batiste v. State*, 121 So. 3d 808, 856 (lineup not impermissibly suggestive when suspect had a lighter photo background). Additionally, the Mississippi Court of Appeals has found features in a photo lineup that are similar to the photo lineup here to be minor differences that were not impermissibly suggestive. *See Jones v. State*, 993 So. 2d 386, 393 (Miss. Ct. App. 2008) (lineup not impermissibly suggestive when defendant was the only person in the lineup wearing a coat that matched the description of the armed robber); *Anderson v. State*, 724 So. 2d 475, 478 (Miss. Ct. App. 1998) (lineup not impermissibly suggestive when suspect's photo was the only one with a white border). The photo lineup here consisted of five photos of males, in different types of clothes, with dreadlocks of varying lengths. Considering the lineup in light of this Court's precedent, Haymon's picture did not have distinguishing features. This Court finds that the photo lineup given to Danzel to identify Haymon was not impermissibly suggestive as to give rise to a substantial likelihood of irreparable misidentification.

### B. The photo lineup was reliable.

¶35. This Court analyzes five factors to determine if an out-of-court identification was reliable:

> (1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description of the criminal; (4) the level of certainty demonstrated by the witness at the confrontation; and (5) the length of time between the crime and

17

the confrontation.

*Latiker*, 918 So. 2d at 74 (quoting *Biggers*, 409 U.S. at 199-200). These factors, applied to the present case, support a finding that both the out-of-court and in-court identifications were reliable. Haymon argues that Danzel was unable to focus on his assailants and supports this argument with Danzel's testimony that he was scared for his life because he was held at gunpoint with his head down in the back seat of the car. But Danzel testified:

> they took their masks up. And that's when I raised my head up, I see the driver. And that was Chub, that's his nickname. That was Chub. I seen the rearview mirror, the mirror. I had seen his face and I seen how his hair. So when we got back up to Double Quick that's when I look up again and then I look to my side and that's when I see her boyfriend.

There is no discrepancy in Danzel's testimony as to the fact that he knew who attacked him.

¶36. Haymon also argues that Danzel could not have been certain who attacked him because he admitted he had a bad memory. However, this testimony from Danzel was referring to his inability to remember phone numbers and legal names in the statements with the police, not the identity of his attackers. The reliability and credibility of Danzel's memory is an issue for the jury to weigh. *Butler*, 102 So. 3d at 268 ("weight and credibility to be given to a witness's testimony 'are within the sole province of the jury as fact finder'" (quoting *King v. State*, 798 So. 2d 1258, 1262 (Miss. 2001))).

¶37. As to the length of time between the crime and the confrontation, Haymon again argues that because law enforcement gave Danzel the names of the suspects, the identification was tainted and unreliable. However, as discussed above, the officers gave Danzel the legal names of the suspects because he only was able to identify their faces and

18

nicknames.

¶38. The only issue that weighs against the reliability of the in-court identification is the length of time between the crime and the confrontation. The trial occurred more than seven years after the night of the crime. However, Danzel had already reliably identified Haymon the day after the crime and all other factors, as discussed above, weigh in favor of the identification's reliability.

¶39. This Court finds substantial credible evidence to support the trial court's finding of reliability of the photo identification.

**CONCLUSION**

¶40. The trial court correctly denied Pernell's request for a jury instruction on the lesser offense of simple assault. Pernell's convictions and sentences are affirmed. The trial court's did not err by denying Haymon's motion to suppress the photo lineup identification because it was not impermissibly suggestive or unreliable. Haymon's convictions and sentences are affirmed.

¶41. **AFFIRMED.**

**RANDOLPH, C.J., KITCHENS AND KING, P.JJ., COLEMAN, MAXWELL, BEAM, ISHEE AND GRIFFIS, JJ., CONCUR.**